THOMAS MELONE (*pro hac vice motion to be filed*)
14 Wall St., 20th Floor
New York, NY 10005
Telephone: (212) 681-1120
Facsimile: (801) 858-8818
Thomas.Melone@AllcoUS.com

*Attorneys for Plaintiff*

MONTGOMERY, McCRACKEN,
    WALKER & RHOADS, LLP
JEFFREY LERMAN (Pa. ID No. 19388)
123 South Broad Street
Philadelphia, PA 19109
Telephone: (215) 772-1500
Facsimile: (215) 772-7620
jlerman@mmwr.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ECOENERGY LLC,<br>    2511 Technology Drive, Suite 110<br>    Elgin, IL  60123,<br>        and<br>MORSE ENERGY LLC,<br>    2511 Technology Drive, Suite 110<br>    Elgin, IL   60123,<br><br>                Plaintiffs,<br><br>v.<br><br>GAMESA ENERGY USA LLC,<br>    1801 Market Street, Suite 2700<br>    Philadelphia, PA   19103,<br><br>                Defendant. | CIVIL ACTION NO.<br><br><br><br>**COMPLAINT FOR BREACH OF<br>CONTRACT** |

## I.  FACTS

1.     Plaintiffs and Defendant are parties to the Membership Interest Purchase and Sale Agreement (the "PSA") dated December 30, 2011, among Gamesa Energy USA, LLC, a Delaware limited liability company ("Gamesa or "Defendant"), Morse Energy, LLC, an Illinois limited liability company ("Morse"), and EcoEnergy, LLC, an Illinois limited liability company ("EcoEnergy") with respect to the purchase of the membership interests of EcoHarmony West Wind LLC, a Minnesota limited liability company ("EcoHarmony"), and (2) the Security

1

3587135v1

1  Agreement (the "Security Agreement") dated December 30, 2011, among Morse and EcoEnergy
2  and Gamesa and EcoHarmony (the "Obligated Parties").  A copy of the PSA is attached hereto as
3  Exhibit "A"; a copy of the Security Agreement is attached hereto as Exhibit "B".

4      2.     The parties agreed in the PSA and the Security Agreement that New York law
5  would be the governing law with respect to the parties' obligations under the PSA and the
6  Security Agreement.

7      3.     Under the PSA, the Defendant purchased all the member interests in
8  EcoHarmony, which was developing a 200 megawatt wind-power electric generating facility in
9  Minnesota.

10      4.     Under the PSA, the Defendant agreed to make certain payments to the Plaintiffs.

11      5.     Pursuant to Section 2.2(b) of the PSA, Gamesa is obligated to pay to the Plaintiffs
12  $500,000 upon the execution of a generator interconnection agreement ("GIA") by EcoHarmony
13  with the Midcontinent Independent System Operator, Inc. ("MISO") within 30 days of such
14  execution.

15      6.     Although originally filed as an unexecuted GIA on October 21, 2011, with the
16  Federal Energy Regulatory Commission ("FERC"), the GIA was accepted by the FERC on
17  March 19, 2012.  Upon information and belief, on or about October 1, 2012, EcoHarmony
18  commenced performance under the GIA by paying the first required payment under the GIA,
19  which was $579,778 (10% of estimated cost of the transmission owner interconnection facilities
20  and network upgrades payable by EcoHarmony in order to connect the wind project to the
21  electrical grid).  Upon receipt of that payment ITC Midwest LLC was required to commence
22  preliminary design of transmission owner interconnection facilities and network upgrades.  Upon
23  information and belief, EcoHarmony continued performance under the GIA by taking action to
24  satisfy other performance requirements of the GIA.

25      7.     The Plaintiffs sent the invoice for the $500,000 payment to Gamesa on November
26  20, 2012 by mail, and on November 27, 2012 by email, and sent the statement of account
27  showing the $500,000 balance by mail to Gamesa on December 31, 2012.  Copies of this invoice
28  and the statement of account are attached hereto as Exhibits "C" and "D", respectively.

2

8. Gamesa has failed to pay the $500,000.

9. Gamesa has not made any objection to the invoice or the statement of account reflecting the $500,000 that Gamesa owes to Plainitffs.

10. Gamesa's failure to pay the invoiced $500,000 constitutes a default in Gamesa's obligations under the PSA.

11. In order to secure Defendant's obligations under the PSA, Gamesa and EcoHarmony granted a security interest in all assets of EcoHarmony to Plaintiffs.

12. In addition, Gamesa and EcoHarmony have breached, and are in default under, their obligations under Section 3 of the Security Agreement because they have failed to maintain title to all the Collateral (which includes the GIA) by executing a termination agreement (the "GIA Termination Agreement") with MISO, which has been filed with the FERC on November 1, 2013, under Docket No. ER14-299.

13. Gamesa and EcoHarmony have also breached, and are in default under, their obligations under Section 3 of the Security Agreement because they have agreed to a cancellation of, and a modification to, the GIA, which is part of the Collateral, by executing the GIA Termination Agreement.

14. The breach by Gamesa in failing to make the payment required by Section 2.2(b) of the PSA and the breach by Gamesa and EcoHarmony caused by the execution of the GIA Termination Agreement each constitute an Event of Default under Section 4 of the Security Agreement, and an event of default under the PSA.

15. By letter dated November 4, 2013, Plaintiffs notified Gamesa and EcoHarmony that they were in default under the PSA and the Security Agreement and that pursuant to Section 4(a) of the Security Agreement, the Plaintiffs declared all Obligations (as defined in the Security Agreement) immediately due and payable. A copy of this letter is attached hereto as Exhibit "E".

16. Section 2.2(d) of the PSA obligates Gamesa to pay $2,500,000 to the Plaintiffs no later than December 30, 2014. As a result of Gamesa and EcoHarmony being in default and the Plaintiffs' declaration that all Obligations are now immediately due and payable, that payment is accelerated and is now due and payable.

3

3587135v1

17. Pursuant to Section 3 of the Security Agreement Gamesa and EcoHarmony must take all such actions as the Plaintiffs reasonably request.

18. The Plaintiffs demanded by letter dated November 4, 2013 (Exhibit "E"), that until Gamesa pays the full $3,000,000 now due and payable, that Gamesa and EcoHarmony immediately notify MISO, ITC Midwest LLC and the FERC that Gamesa and EcoHarmony were suspending any further action toward terminating the GIA.

19. In addition, the Plaintiffs demanded that until Gamesa pays the full $3,000,000 now due and payable, that Gamesa and EcoHarmony immediately take all action necessary or desirable to prevent the termination of the GIA.

20. The Defendant has failed to respond to Plaintiffs' notice of default, demand for payment and demand that it cease all action terminating the GIA.

## II.  JURISDICTION, VENUE AND THE PARTIES

21. Plaintiffs are Illinois limited liability companies whose principal place of business is in Illinois and whose members are entirely Illinois citizens.

22. Upon information and belief, Defendant is a Delaware limited liability company, whose principal place is in Pennsylvania, and whose members do not include any Illinois citizens.

23. The amount in controversy exceeds $75,000.

24. This Court has original jurisdiction based on diversity jurisdiction under 28 U.S.C. §1332.

25. Venue in this Court is proper because the Defendant is located in this district.

26. In addition, pursuant to Section 10.6 of the PSA, the Plaintiffs and the Defendant agreed to the nonexclusive jurisdiction of this Court.

## COUNT I
## BREACH OF CONTRACT

27. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 26 as though fully set forth herein.

4

3587135v1

28.     The Defendant has breached its obligations under the PSA and the Security Agreement.

29.     The Defendant has failed to pay the $3,000,000 to Plaintiffs that is currently due and payable under the PSA in breach of its obligation under the PSA and the Security Agreement.

**COUNT II**
**ACCOUNT STATED**

30.     Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 29 as though fully set forth herein.

31.     The Plaintiffs sent the invoice for the $500,000 payment to Gamesa on November 20, 2012 by mail, and on November 27, 2012 by email.

32.     The Plaintiffs sent a statement of account reflecting the $500,000 balance due to Plaintiffs from Gamesa by mail to Gamesa on December 31, 2012.

33.     Gamesa has failed to pay the $500,000.

34.     Gamesa received the invoice and the statement of account and has not made any objection to the invoice or the statement of account reflecting the $500,000 that Gamesa owes to Plaintiffs.

**III.     PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

(1)     That the Court enter judgment for Plaintiffs in the amount of $3,000,000 plus Plaintiffs' costs incurred related to bringing this action (including reasonable attorneys' fees), and

(2)     That Plaintiffs be granted such other further relief as the Court may deem just and proper.

Dated:  December 23, 2013

Thomas Melone/ces

Thomas Melone (*pro hac vice motion to be filed*)
14 Wall St., 20th Floor
New York, NY 10005
(212) 681-1120

5

3587135v1

and

_Jeffrey R. Lerman / CEJ_

Jeffrey R. Lerman
Pa. ID No. 19388
Montgomery, McCracken,
     Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA   19109
(215) 772-1500

*Attorneys for Plaintiffs*

3587135v1

# EXHIBIT "A"

MEMBERSHIP INTEREST
PURCHASE AND SALE AGREEMENT

IN RESPECT OF

ECOHARMONY WEST WIND, LLC

BY AND AMONG

GAMESA ENERGY USA, LLC,

MORSE ENERGY, LLC

AND

ECOENERGY, LLC

DATED AS OF

DECEMBER 30, 2011

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ............................................................................................... 1

1.1 Definitions ..................................................................................................................... 1
1.2 Rules of Interpretation ................................................................................................. 7

ARTICLE 2 PURCHASE AND SALE; CLOSING ........................................................ 7

2.1 The Closing ................................................................................................................... 7
2.2 Payments ....................................................................................................................... 8
2.3 Closing Deliveries ...................................................................................................... 10
2.4 Development and Construction of Project Post-Closing ........................................... 10
2.5 Reversionary Interest ................................................................................................. 10

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF SELLER ................... 11

3.1 Organization, Qualification and Power ..................................................................... 11
3.2 Authorization .............................................................................................................. 11
3.3 Enforceability ............................................................................................................. 11
3.4 Noncontravention ....................................................................................................... 11
3.5 Title to Site ................................................................................................................. 12
3.6 Limited Purpose Entity .............................................................................................. 12
3.7 Ownership ................................................................................................................... 12
3.8 Balance Sheet ............................................................................................................. 12
3.9 Absence of Changes ................................................................................................... 13
3.10 Liabilities ................................................................................................................... 13
3.11 Books and Records .................................................................................................... 13
3.12 Material Contracts ..................................................................................................... 13
3.13 Litigation .................................................................................................................... 13
3.14 Employees .................................................................................................................. 14
3.15 Taxes .......................................................................................................................... 14
3.16 Environmental Matters; Project Permits ................................................................... 14
3.17 Governmental Approvals ........................................................................................... 15
3.18 Investment Company .................................................................................................. 15
3.19 Brokers' Fees ............................................................................................................. 15
3.20 Wind Data .................................................................................................................. 15
3.21 Disclaimer of Other Representations and Warranties ............................................... 16

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................... 17

4.1 Organization ............................................................................................................... 17
4.2 Authorization .............................................................................................................. 17
4.3 Enforceability ............................................................................................................. 17
4.4 Noncontravention ....................................................................................................... 17
4.5 Legal Proceedings ...................................................................................................... 17

| 4.6 | Bankruptcy | 18 |
| 4.7 | Not a Public Utility or Investment Company; Exon-Florio | 18 |
| 4.8 | Accredited Investor; Investment | 18 |
| 4.9 | Brokers' Fees | 18 |
| 4.10 | Funding | 18 |
| 4.11 | Due Diligence Investigation and Other Acknowledgements | 18 |

**ARTICLE 5 CONDITIONS TO OBLIGATIONS TO CLOSE**    19

| 5.1 | Conditions to Obligation of Buyer | 19 |
| 5.2 | Conditions to Obligation of Sellers | 20 |

**ARTICLE 6 INDEMNIFICATION**    21

| 6.1 | Survival | 21 |
| 6.2 | Indemnification by Seller | 21 |
| 6.3 | Indemnification by Buyer | 21 |
| 6.4 | Limitations on Indemnity | 22 |
| 6.5 | Mitigation and Limitations on Losses | 22 |
| 6.6 | Matters Involving Third Parties | 23 |

**ARTICLE 7 CERTAIN INTERIM COVENANTS**    24

| 7.1 | Continued Development of the Project | 24 |
| 7.2 | Efforts to Close | 24 |
| 7.3 | Satisfaction of Conditions | 25 |
| 7.4 | Transfer Taxes | 25 |
| 7.5 | Notice of Developments | 25 |
| 7.6 | Casualty Events | 26 |
| 7.7 | Further Assurances | 26 |
| 7.8 | Securities Law Covenant | 26 |
| 7.9 | Announcements | 26 |
| 7.10 | Confidentiality | 27 |

**ARTICLE 8 TAX MATTERS**    27

| 8.1 | Tax Periods Ending on or Before the Closing Date | 27 |
| 8.2 | Tax Periods Beginning Before and Ending After the Closing Date | 27 |
| 8.3 | Refunds and Tax Benefits; Amended Tax Returns | 28 |
| 8.4 | Cooperation on Tax Matters | 28 |

**ARTICLE 9 TERMINATION**    28

| 9.1 | Termination | 28 |
| 9.2 | Effect of Termination | 29 |

**ARTICLE 10 MISCELLANEOUS**    29

| | | |
|---|---|---|
| 10.1 | No Third Party Beneficiaries | 29 |
| 10.2 | Succession and Assignment | 29 |
| 10.3 | Counterparts | 30 |
| 10.4 | Headings | 30 |
| 10.5 | Notices | 30 |
| 10.6 | Governing Law; Forum; Submission to Jurisdiction | 31 |
| 10.7 | WAIVER OF JURY TRIAL | 31 |
| 10.8 | Expenses; Attorney's Fees | 31 |
| 10.9 | Amendments and Waivers | 31 |
| 10.10 | Severability | 32 |
| 10.11 | Enforcement of the Agreement | 32 |
| 10.12 | Construction | 32 |
| 10.13 | Incorporation of Exhibits and Schedules | 32 |
| 10.14 | Entire Agreement | 32 |
| 10.15 | Time is of the Essence | 32 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Sellers' Knowledge |
| Exhibit B | Buyer's Knowledge |
| Exhibit C | Form of Assignment and Assumption Agreement |
| Exhibit D | Form of Security Agreement |

## SCHEDULES

Seller Disclosure Schedule

Buyer Disclosure Schedule

# MEMBERSHIP INTEREST
# PURCHASE AND SALE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of December 30, 2011, by and among Gamesa Energy USA, LLC, a Delaware limited liability company, ("Buyer"), Morse Energy, LLC, an Illinois limited liability company ("Morse"), and EcoEnergy, LLC, an Illinois limited liability company ("EcoEnergy" and, collectively with Morse, "Sellers"). Buyer and Sellers are referred to collectively herein as the "Parties."

## RECITALS

A. EcoHarmony West Wind LLC, a Minnesota limited liability company ("EcoHarmony West"), is developing a wind-powered electric generating facility with an expected total installed nameplate capacity of approximately two hundred (200) megawatts located in Fillmore County, Minnesota commonly known as the EcoHarmony West Wind Project (the "Project").

B. Sellers are the sole members of EcoHarmony West.

C. Subject to the terms and conditions set forth herein, the Parties desire that Buyer shall acquire from Sellers all of the membership interests of EcoHarmony West.

NOW, THEREFORE, in consideration of the premises and the mutual promises made in this Agreement, and in consideration of the representations, warranties, and covenants contained in this Agreement, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     Definitions.

"Action" means any complaint, suit, proceeding, claim, arbitration, demand, assertion or other similar action.

"Affiliate" of a specified Person means any other Person which directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. As used in this definition, each of the terms "control," "controlled by" and "under common control with" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Agreement, including the Schedules and exhibits attached hereto.

"Business Day" means any day except a Saturday or a Sunday or a day when commercial banks are authorized or required by Law to be closed in the Commonwealth of Pennsylvania or the State of Illinois.

"Buyer" has the meaning set forth in the introductory paragraph above.

"Buyer Consents" has the meaning set forth in Section 4.4 below.

"Buyer Disclosure Schedule" has the meaning set forth in Article 4 below.

"Buyer Fundamental Representations and Warranties" has the meaning set forth in Section 6.1(a)(ii) below.

"Buyer Indemnified Persons" has the meaning set forth in Section 6.2 below.

"Cap Amount" has the meaning set forth in Section 6.4 below.

"Closing" has the meaning set forth in Section 2.1(f) below.

"Closing Date" has the meaning set forth in Section 2.1(f) below.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commencement of Construction" means the first date that the installation or erection of any improvements at the site of the Project has begun, including without limitation, foundations, underground cables and roads.

"Confidentiality Agreement" has the meaning set forth in Section 7.10 below.

"Contract" means any agreement, arrangement, lease, license, evidence of indebtedness, mortgage, indenture, security agreement or other contract, including any amendments thereto.

"Deductible Amount" has the meaning set forth in Section 6.4 below.

"EcoHarmony West" has the meaning set forth in the recitals above.

"Encumbrance" means any mortgage, pledge, lien, encumbrance, charge, other security interest or defect in title.

"Environmental Law" means any applicable federal, state, provincial or local law, statute, ordinance, regulation, permit or valid and legally-binding order of any Governmental Authority relating to (a) the protection, preservation or restoration of the environment (including air, surface water, groundwater, surface land, subsurface land, plant and animal life or any other natural resource), (b) the exposure to, or the Release of Hazardous Substances. For the purposes of this definition, "Environmental Law" shall include, without limitation, the Resource Conservation and Recovery Act (42 U.S.C. §6901, et seq.), the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. §1801, et seq.), the Toxic Substances Control Act (15 U.S.C. §2601, et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §136, et seq.), the Clean Air Act (42 U.S.C. §7401, et seq.), the Clean Water Act (33 U.S.C. §1251, et seq.) the Endangered Species Act (16 U.S.C. § 1531 et seq.), the National Environmental Policy Act (42 U.S.C. § 4321 et seq.), the Migratory Bird Treaty Act (16 U.S.C. § 703 et seq.), the Bald and Golden Eagle Protection Act (16 U.S.C. § 668 et seq.), the Oil Pollution Act (33 U.S.C. § 2701 et seq.), the Occupational Health and Safety Act of 1970, 29 U.S.C. § 651 et seq. (to the extent it regulates exposure to Hazardous Substances) and any other federal, state or local Law of similar effect.

"FERC" means the Federal Energy Regulatory Commission, or successor agency.

"Final Closing Date" means December 30, 2011.

"FPA" means the Federal Power Act, as amended.

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Approvals" means any authorization, approval, consent, license, registration, lease, ruling, permit, tariff, certification, exemption, filing or registration by or with any Governmental Authority.

"Governmental Authority" means the United States and any state, county, or city, or any political subdivision, agency, court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of any of the foregoing.

"Hazardous Substances" means any material, substance or waste (whether liquid, gaseous or solid) that (i) requires removal, remediation or reporting under any Environmental Law, or is listed, classified or regulated as a "pollutant," "contaminant," "hazardous waste" or "hazardous substance" (or other similar term) pursuant to any applicable Environmental Law or (ii) is regulated under applicable Environmental Laws as being, toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous.

"Income Tax" means any federal, state, local or foreign income Tax or other Tax based upon, measured by, related to or calculated with respect to gross or net income, profits or receipts, including any interest, penalty or addition attributable to such Tax, whether disputed or not.

"Indemnified Party" means the Party against whom indemnification is sought pursuant to Section 6.2 or 6.3 (as applicable).

"Indemnifying Party" means the Party seeking indemnification pursuant to Section 6.2 or 6.3 (as applicable).

"Interests" has the meaning set forth in Section 2.1(a) below.

"Knowledge," "known" and "knows," whether or not capitalized, when used with reference to any matter covered by a representation, warranty, covenant or other provision of this Agreement, means (i) with respect to Sellers, the actual knowledge of the individuals listed on Exhibit A, and (ii) with respect to Buyer, the actual knowledge of the individuals listed on Exhibit B.

"Laws" means any constitution, statute, code, regulation, rule, injunction, Order, judgment, ruling, charge, or other restriction of any applicable Governmental Authority.

"Liability" means any liability or obligation of whatever kind or nature, whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due.

"Losses" means, with respect to any Person, any and all losses, liabilities, damages, claims or expenses (including reasonable attorneys' fees and costs of investigation thereof).

"Material" means, when used with respect to EcoHarmony West or the Project, material to EcoHarmony West and the Project, taken as a whole.

"Material Adverse Effect" means, with respect to EcoHarmony West or the Project, any change, event, fact, condition, effect or occurrence that is materially adverse to (i) the business, financial condition, assets, liabilities or results of operations of EcoHarmony West and the Project, taken as a whole or (ii) the ability of Sellers to perform their obligations under this Agreement; provided, that a "Material Adverse Effect" shall not include changes, events, effects or occurrences (individually or taken together) resulting from or arising out of (a) any change generally affecting the national or regional: (1) electric generating, transmission or distribution industry, (2) wholesale or retail markets for electric power, natural gas or coal, (3) electrical transmission and distribution systems, rail transportation or natural gas transportation and distribution systems, or (4) economic conditions generally or in the wind energy industry; (b) any change in markets for commodities or supplies, including electric power, natural gas, emissions, fuel, coal or water; (c) any change in the design or pricing of the wholesale or retail electric power and natural gas markets (including any change in the forward reserve markets, day-ahead markets, real-time markets, ancillary services markets and emissions markets (including any change in the MISO administered capacity auctions, day-ahead markets, real-time markets and ancillary services markets)); (d) any change in the financial, banking or securities markets or any change in the general international, national or regional economic conditions, including as a result of terrorist activity, acts of war or acts of public enemies; (e) the announcement or pendency of the transactions contemplated hereby or any actions to be taken pursuant to or in accordance with this Agreement or any other Transaction Document; (f) changes in any industry standards, Laws, GAAP, or regulatory accounting requirements or changes in the interpretation thereof as such relate to EcoHarmony West or the Project; (g) earthquakes, hurricanes, floods, acts of God or other natural disasters; (h) the failure or inability of EcoHarmony West to meet any internal or public projections, forecasts or estimates of revenues or earnings or any change in the ability to further develop or expand the Project; (i) acts of war, sabotage or terrorism, military actions or the escalation thereof; (j) the results of any auction conducted under the auspices of MISO (including any MISO auctions); (k) any action taken at the express written request of Buyer and/or its Affiliates; or (l) any event or circumstance caused by Buyer and/or its Affiliates, or their ability or inability, collectively or individually, to obtain financing (whether debt or equity) for purposes of satisfying their obligations under this Agreement.

"Material Contracts" has the meaning set forth in Section 3.12(a) below.

"MISO" means the Midwest Independent Transmission System Operator or successor entity.

"Moody's" means Moody's Investors Services, Inc. and its successors.

"MPUC" means the Minnesota Public Utilities Commission.

"Order" means any injunction, judgment, order, decree, ruling, or charge of a Governmental Authority.

"Ordinary Course of Business" means the ordinary course of business consistent with the affected Party's past custom and practice (including with respect to quantity and frequency).

"Parties" means Sellers and Buyer and "Party" means any of Sellers or Buyer.

"Permitted Encumbrances" means any of the following: (i) the Encumbrances listed on Section 1.1(b) of the Seller Disclosure Schedule, (ii) Encumbrances for taxes and assessments or other charges or levies of Governmental Authorities that are not yet delinquent or are being contested in good faith by appropriate proceedings, (iii) Encumbrances incurred in the Ordinary Course of Business (including inchoate Encumbrances of carriers, warehousemen, mechanics, materialmen, repairmen or inchoate Encumbrances in connection with workers' compensation, unemployment insurance or other types of social security), (iv) any obligations or duties reserved to or vested in any municipality or other Governmental Authority to regulate any asset in any manner including all applicable Laws, (v) with respect to the Interests, any restrictions on further transfer under any Project Documents or imposed by applicable securities laws, (vi) defects of title, easements, rights of way, and other similar charges or Encumbrances that do not materially interfere with the operation of the Project, (vii) zoning, building and other generally applicable land use restrictions which are not violated by the current use of the Project, (viii) prior to the Closing, Encumbrances incurred in the Ordinary Course of Business which are capable of being discharged in full by the Closing, and (ix) after the Closing, the security interest in favor of Sellers granted pursuant to the Security Agreement.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Authority.

"Power Purchase Agreement" has the meaning set forth in Section 5.2(h) below.

"Pre-Closing Tax Period" has the meaning set forth in Section 8.2 below.

"Project" has the meaning set forth in the recitals above.

"Project Documents" means the Material Contracts and the Project Permits.

"Project Permits" means all material Governmental Approvals owned or held by EcoHarmony West and used or to be used in connection with the development, design, engineering, construction, interconnection, ownership and operation of the Project.

"Property Tax" means any Tax resulting from and relating to the assessment of real or personal property by any Governmental Authority.

"PUHCA" means the Public Utility Holding Company Act of 2005, as amended.

"Purchase Price" has the meaning set forth in Section 2.1(c) below.

"PURPA" means the Public Utility Regulatory Policies Act of 1978, as amended.

"Release" means any actual release, spill, leak, discharge, abandonment, disposal, pumping, pouring, emitting, emptying, injecting, leaching, dumping, depositing, dispersing, or migration into or through the environment (including ambient air, surface water, groundwater,

surface land, and subsurface land) of any Hazardous Substance, including the abandonment or discarding of Hazardous Substance in barrels, drums, or other containers.

"Renewable Energy Incentives" shall mean: (a) federal, state, or local tax credits associated with the construction, ownership, or production of electricity from the Project (including credits under Sections 38 and 45K of the Internal Revenue Code of 1986, as amended); (b) any investment tax credits and any other tax credits associated with the Project (including credits under Sections 38 and 48 of the Internal Revenue Code of 1986, as amended); (c) any state, federal or private cash payments or grants relating in any way to the Project or the output thereof; (d) state, federal or private grants or other benefits related to the Project or the output thereof; and (e) any other form of incentive that is not an Environmental Attribute that is available with respect to the Project.

"Representative" of any Person, means any director, officer, consultant, employee, agent, advisor or other representative of such Person.

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and its successors.

"Schedules" means the Buyer Disclosure Schedule and the Seller Disclosure Schedule.

"Securities Act" means the Securities Act of 1933, as amended.

"Securities Law" has the meaning set forth in Section 4.8 below.

"Security Agreement" means the Security Agreement, dated as of the Closing Date, by Buyer in favor of Sellers.

"Seller Consents" means the consents listed in Section 3.4.

"Seller Disclosure Schedules" has the meaning set forth in Article 3 below.

"Seller Fundamental Representations and Warranties" has the meaning set forth in Section 6.1(a)(i) below.

"Seller Indemnified Persons" has the meaning set forth in Section 6.3 below.

"Sellers" has the meaning set forth in the introductory paragraph above.

"Site" has the meaning set forth in Section 3.5 below.

"Survival Period" has the meaning set forth in Section 6.1 below.

"Tax" or "Taxes" means any and all taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Authority or taxing authority, including, without limitation: (i) taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth; (ii) taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added, or gains taxes; and (iii) customs' duties, tariffs, and similar charges.

"Tax Returns" means all income, excise, sales unemployment, employer and employee withholding, social security, occupation, franchise, and other Tax returns or Tax reports required by federal, state or local Law or regulation.

"Third Party Claim" has the meaning set forth in Section 6.6(a) below.

"Third Party Work Product" has the meaning set forth in Section 6.5(c) below.

"Transaction Documents" means this Agreement and any other documents, Contracts or instruments delivered at Closing pursuant to Section 2.2 hereof.

"Wind Data Documents" has the meaning set forth in Section 3.21 below.

"Wind Engineer" means AWS Truepower.

1.2    Rules of Interpretation.

(a)    Plural.  The singular includes the plural, and the plural includes the singular.

(b)    Inclusive.  A reference to any Law includes any amendment or modification thereto, all rules and regulations promulgated under such Law and all administrative and judicial authority exercisable thereunder.

(c)    Reference to Persons.  A reference to a Person includes its permitted successors and assigns.

(d)    GAAP Accounting.  All accounting terms used but not specifically defined herein shall bear the meaning ascribed thereto by the Financial Accounting Standards Board.

(e)    Construction.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provisions of this Agreement, and section, schedule and exhibit references are to this Agreement unless otherwise specified.  The word "including" shall mean including without limitation.

(f)    Dates.  Any date specified for any action that is not a Business Day shall be deemed to mean the first Business Day after such date.

## ARTICLE 2
## PURCHASE AND SALE; CLOSING

2.1    The Closing.  At the Closing, subject to the terms and conditions hereof, the following shall occur:

(a)    Sale and Purchase of Interests.  Concurrently with the payment of the Closing Payment by Buyer to Sellers at Closing as provided in Section 2.2(a), Sellers shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and acquire from Sellers, all of the issued and outstanding membership interests in EcoHarmony West (the "Interests"), free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)    Assumption and Release.  The documents listed in Section 2.1(b) of the Seller Disclosure Schedule shall be released and discharged and, to the extent any of such documents constitute security or collateral for obligations of EcoHarmony West, Buyer shall cause such security or collateral to be replaced in accordance with the applicable terms of the contract under which the same is required to be posted or provided.

2.2    Payments.

(a)    Closing Payment.  On the Closing Date, Buyer will pay Sellers the sum of Twenty Thousand Dollars ($20,000.00) in immediately available funds.

(b)    Interconnection Agreement Payment.  In addition to the closing payment pursuant to Section 2.2(a), Buyer will pay to Sellers the sum of Five Hundred Thousand Dollars ($500,000.00) in immediately available funds upon execution of a generator interconnection agreement by EcoHarmony West with MISO and the applicable transmission-owning utility either (1) before the Closing, or (2) at any time Buyer owns EcoHarmony West.  Prior to the Closing, Sellers will coordinate and discuss the terms of the proposed interconnection agreement with Buyer prior to its execution.  If EcoHarmony West executes the interconnection agreement prior to Closing, Buyer will pay the $500,000 to Sellers at Closing; and if EcoHarmony West executes the interconnection agreement at any time that Buyer owns EcoHarmony West, Buyer will pay Sellers the $500,000 within 30 days of execution of the interconnection agreement.

(c)    Payment Based on Sale of Project by Buyer.  In addition to the payments pursuant to Sections 2.2(a) and (b), Buyer will make an additional payment to Sellers as follows:

(i)    Payment Based on Sale of Project Prior to Construction.  If Buyer sells the Project or its membership interests in EcoHarmony West to a third party before Commencement of Construction of the Project, Buyer and Sellers will share in the gross proceeds of the sale on an equal, 50/50 basis until one Party has recovered its basis in the Project; thereafter, 100% of the proceeds of the sale will be allocated to the Party that has not recovered its basis in the Project, until such Party has recovered its basis.  Once each Party has recovered its basis, then the gross proceeds of the sale to a third party will be allocated 80% to Buyer and 20% to Sellers; provided, however, that in the event of a sale by Buyers where the gross proceeds are insufficient to allow Sellers to collect a payment of at least $2,000,000 according to the above formula, Buyer will pay Sellers a minimum of Two Million Dollars ($2,000,000.00) (but not in addition to any payment which would otherwise be due Sellers according to the above formula).  Solely for purposes of this Section 2.2(c)(i), any sale of the interconnection (specifically, MISO queue position G746) owned by EcoHarmony West will be deemed to be a sale of the Project.

So, by way of example, assume Sellers collectively have a basis of $4 million in the Project (or in EcoHarmony West), and Buyer has a basis in the Project (or in EcoHarmony West) of $100,000 at the time of the sale to the third party.  Further assume Buyer sells the Project to a third party for $10 million (i.e., $50,000/MW).  Under this Section 2.2(c)(i), the sale proceeds would be allocated as follows: (i) first, $100,000 to Sellers, $100,000 to Buyer; (ii) second, $3.9 million to Sellers and zero to Buyer; and (iii) last, the remaining $5.9 million in proceeds to be allocated 80% to Buyer ($4.72 million) and 20% to Sellers ($1.18 million).

By way of another example, assume Sellers collectively have a basis of $4 million in the Project (or in EcoHarmony West), and Buyer has a basis in the Project (or in EcoHarmony West) of $100,000 at the time of the sale to a third party. Further assume Buyer sells the Project to a third party for $1 million ($5,000/MW). Under this Section 2.2.(c)(i), the sale proceeds would be allocated as follows: (i) *first*, $100,000 to Sellers, $100,000 to Buyer; (ii) *second*, the remaining $800,000 to Sellers. Because Buyer is obligated to pay Sellers a minimum of $2,000,000 where the gross proceeds are insufficient to allow Sellers to collect a payment of at least $2 million according to the above formula, however, Buyer has an obligation to pay Sellers an additional $1.1 million (which funds Gamesa would need to independently source).

   (ii) Payment Based on Sale of Project After Commencement of Construction. In addition to the payments required by Section 2.2(d), if Buyer sells the Project or its membership interests in EcoHarmony West to a third party after Commencement of Construction on the Project, Buyer will pay to Sellers the lesser of (a) 1% of the gross Project sales price from the third party or Two Million Dollars ($2,000,000.00);

   (iii) Access to Books and Records. In order to determine each Party's basis in EcoHarmony West or the Project, and the Project sales price pursuant to this Section 2.2(c), reasonable access to all books and records relating to EcoHarmony West and the Project shall be granted to the Parties. The Parties shall have the right to inspect such books and records, and to verify their accuracy through an accounting of such books and records.

   (d) Payment Based on Construction of the Project or 3 Years from Closing Date. Buyer will pay Sellers Two Million Five Hundred Thousand Dollars ($2,500,000.00) on the earlier of (i) the Commencement of Construction of the Project or (ii) the third anniversary of the Closing Date; provided, however, that if Sellers acquire the Project pursuant to Section 2.5, no payment shall be owed by Buyer to Sellers pursuant to this Section 2.2(d).

   (e) Payment Based on Certain Power Purchase Agreement. If Buyer or EcoHarmony West (or any successor to EcoHarmony West's interconnection queue position) executes one or more power purchase agreements using the interconnection owned by EcoHarmony West and sold to Buyer pursuant to this Agreement, Buyer will pay Sellers Ten Thousand Dollars ($10,000.00) per megawatt of nameplate capacity contracted for sale under such power purchase agreement(s), provided, however that the total amount of the payment(s) regardless of the number of power purchase agreement(s) executed is limited to (i.e., "capped" at) One Million Dollars ($1,000,000.00). Payment(s) under this Section 2.2(e) is(are) due from Buyer to Sellers when the first payment(s) for the energy sold under the power purchase agreement(s) are made by the power purchase agreement(s) counterparties to Buyer or EcoHarmony West.

   (f) Closing. The closing of the sale of the Interests pursuant to this Agreement (the "Closing") shall take place at the offices of Buyer in Minneapolis, Minnesota, commencing at 9:00 a.m. local time on the third (3rd) Business Day following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby (other than those conditions that by their nature are to be satisfied at the Closing but subject to satisfaction of such condition at Closing), or at such other date, time, method and location as Buyer and Sellers may mutually agree (the "Closing Date").

2.3    Closing Deliveries.

(a)    Sellers' Closing Deliverables.  At Closing, Sellers will deliver, or cause to be delivered, to Buyer or its designees (i) a counterpart executed by Sellers to an agreement assigning and conveying the Interests to Buyer in accordance with the terms of this Agreement, substantially in the form of Exhibit C hereto, and (ii) the documents specified in Sections 5.1(d),(e),(h) and (i).

(b)    Buyer's Closing Deliverables.  At Closing, Buyer will deliver, or cause to be delivered, to Sellers or their designees: (i) the amounts required to be paid in Section 2.2; (ii) counterpart executed by Buyer to an agreement assigning and conveying the Interests to Buyer in accordance with the terms of this Agreement, substantially in the form of Exhibit C hereto; (iii) counterpart executed by Buyer and EcoHarmony West to a security agreement granting to Sellers a security interest in EcoHarmony West and its assets, as security for Buyer's obligations under this Agreement, substantially in the form of Exhibit D hereto; and (iv) the documents specified in Sections 5.2(d) and (e).

(c)    Other Deliverables.  In addition, Buyer and Sellers shall execute and deliver any other documents required for closing under applicable Law, and any other customary closing documents reasonably requested by either Party to demonstrate satisfaction of the conditions and compliance with the covenants set forth in this Agreement.

2.4    Development and Construction of Project Post-Closing.  The Parties acknowledge and agree that commencing on the Closing Date, further development or construction of the Project and the decision to perform or not perform or when to perform or not perform any actions or activities (including the decision to actively proceed or not to actively proceed or to abandon the Project), shall be carried out by Buyer in its sole and absolute discretion. Notwithstanding anything to the contrary in this Agreement, Buyer shall have no obligation to invest in, further develop, or construct the Project, or any portion thereof, which investment, development, construction, or other pursuit shall proceed (or not proceed) at Buyer's sole and absolute discretion.  Sellers acknowledge that Buyer is making no representation or warranty, express or implied, regarding the development, investment or construction, or intent to develop, invest in or construct, all or any portion of the Project.  Sellers acknowledge that further development and construction of the Project is not guaranteed.

2.5    Reversionary Interest.  In the event that the Buyer does not begin construction of the Project within three years following the Closing Date, Sellers have the option but not the obligation to purchase from Buyer on the Project or the membership interests of EcoHarmony West an "as-is," "where-is" basis; provided, however, that (a) the Project and the membership interests shall be free and clear of Encumbrances other than Permitted Encumbrances, and (b) Buyer shall represent and warrant to Sellers the same representations and warranties as the Seller Fundamental Representations and Warranties. If Sellers elect to purchase the Project or the membership interests of EcoHarmony West, the purchase price shall be Buyer's basis in the Project or EcoHarmony West, and will be due and payable on the earlier of (i) the date Sellers begin construction of the Project or (ii) the date Sellers sell the Project (or EcoHarmony West) to a third party.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the disclosure schedule delivered by Sellers to Buyer prior to the execution of this Agreement, including the documents attached to or delivered together with such disclosure schedule (the "Seller Disclosure Schedule"), each such Seller represents and warrants to Buyer, for itself only and not in respect of the other Seller, as follows:

3.1 <u>Organization, Qualification and Power.</u> Such Seller is a limited liability company duly organized and validly existing, and has the requisite limited liability company power and authority to conduct its business as it is now conducted and is in good standing under the Laws of the State of Illinois. EcoHarmony West (i) is a limited liability company duly organized and validly existing under the Laws of the State of Minnesota, (ii) has the requisite limited liability company power and authority to conduct its business as it is now conducted and to own its properties and assets and (iii) is in good standing under the Laws of the State of Minnesota. EcoHarmony West is duly qualified or licensed to do business as a limited liability company in each jurisdiction in which the development, design, engineering, construction, ownership and operation of the Project make such qualification or licensing necessary, except in each case in those jurisdictions where the failure to be so duly qualified or licensed would not reasonably be expected to have a Material Adverse Effect.

3.2 <u>Authorization.</u> Such Seller has the requisite limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, including to sell and transfer (pursuant to this Agreement) the Interests. The execution and delivery by such Seller of this Agreement and the other Transaction Documents and the performance by such Seller of its obligations hereunder and thereunder, have been duly and validly authorized by the requisite limited liability company action on the part of such Seller.

3.3 <u>Enforceability.</u> This Agreement has been duly and validly executed and delivered by such Seller and constitutes, and upon the execution and delivery by such Seller of the other Transaction Documents, such Transaction Documents will constitute (in each case assuming the due and valid execution and delivery by each other party hereto and thereto), its valid and legally binding obligation, enforceable against it in accordance with its terms and conditions, subject, however, to the effects of bankruptcy, insolvency, reorganization, arrangement, moratorium or similar Laws affecting creditors' rights generally, to general principles of equity (regardless of whether such enforceability is considered in an Action in equity or at law).

3.4 <u>Noncontravention.</u> The execution and delivery by such Seller of this Agreement does not, and the execution and delivery of each of the other Transaction Documents by such Seller and performance by such Seller of its obligations under this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby will not: (i) conflict with or result in a violation of any Law applicable to such Seller or EcoHarmony West, except for such violations which would not be reasonably expected to have a Material Adverse Effect; (ii) conflict with or result in a violation of any provision of the organizational documents of such Seller; or (iii) conflict with, result in a breach of, constitute a default under, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which such Seller or EcoHarmony West, as applicable, is a party or by which it is bound or to which any of its assets is subject, except for such violations, defaults, breaches, or

other occurrences as to which requisite waivers or consents have been obtained or which would not reasonably be expected to have a Material Adverse Effect. Except as set forth in Section 3.4 of the Seller Disclosure Schedule (the "Seller Consents"), no consent, filing, notice, authorization, or approval of any Governmental Authority or other Person on the part of such Seller is required in connection with the execution, delivery and performance of this Agreement or any of the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby, except where the failure to obtain such consent, give notice, file, or to obtain any authorization or approval would not reasonably be expected to have a Material Adverse Effect or materially adversely affect the ability of such Seller to consummate the transactions contemplated by this Agreement.

3.5    Title to Site. Except as set forth in Section 3.5 of the Seller Disclosure Schedule, EcoHarmony West owns or leases all of the real property used in the operation of the Project (the "Site"), in each case free and clear of all Encumbrances, except for Permitted Encumbrances. To such Seller's Knowledge, there are no pending condemnation or eminent domain proceedings that affect the real property used in connection with the Project and such Seller has not received any written notice of the intention of any Governmental Authority or other Person to take any of the real property used in connection with the Project. With respect to the representation and warranties set forth in this Section 3.5, it is expressly understood and agreed that such Seller makes no representations (i) about the conditions of the assets that constitute the Project and (ii) with respect to any rights, obligations or duties reserved to or vested in any Governmental Authority to regulate any asset in any manner, including all Laws, and any such rights, obligations or duties reserved to or vested in any Governmental Authority to regulate any asset in any manner shall not be considered an "Encumbrance" for purposes of the representations and warranties contained in this Agreement.

3.6    Limited Purpose Entity. The assets constituting the Project are the only assets owned by EcoHarmony West. The sole business of EcoHarmony West is, and has been during its entire existence, the development, planning and permitting of the Project as contemplated by the Project Documents.

3.7    Ownership. EcoEnergy owns 99.0% and Morse Energy owns 1.0% of all of the outstanding membership interests of EcoHarmony West, in each case free and clear of all Encumbrances other than Permitted Encumbrances. All of the issued and outstanding membership interests of the Project have been duly authorized and are validly issued and are fully paid and nonassessable. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts, agreements, commitments, equities, Actions, or demands that require EcoHarmony West to issue, sell, or otherwise cause to become outstanding any of the Interests or any equity securities or other interests in EcoHarmony West or that could require such Seller to sell, transfer, or otherwise dispose of any interest in EcoHarmony West (other than this Agreement). Such Seller is not a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any of the interests in EcoHarmony West. Upon the consummation of the transactions contemplated hereby, Buyer will acquire good and valid title to all issued and outstanding membership interests of EcoHarmony West, free and clear of all Encumbrances, except Permitted Encumbrances.

3.8    Balance Sheet. Sellers have delivered to Buyer (i) an unaudited balance sheet of EcoHarmony West as of October 31, 2011. Such balance sheet presents all assets and liabilities

of EcoHarmony West as of the date thereof or for the periods referred to therein, as the case may be, in accordance with GAAP, subject to normal recurring year-end adjustments.

3.9     Absence of Changes.  Except as set forth in Section 3.9 of the Seller Disclosure Schedule, since October 31, 2011, (i) Sellers have conducted the development, construction and other operations of EcoHarmony West in the Ordinary Course of Business and (ii) there has been no event, occurrence or development which has had or would reasonably be expected to have a Material Adverse Effect on EcoHarmony West or the Project.

3.10    Liabilities.  EcoHarmony West does not have any material Liabilities or obligations, whether absolute or contingent, other than Liabilities or obligations: (i) reflected or reserved for in the balance sheet described in Section 3.8, (ii) matters listed on Section 3.10 of ✗ the Seller Disclosure Schedule, (iii) under the Project Documents, or (iv) incurred in the Ordinary Course of Business since October 31, 2011.  To the Knowledge of such Seller, EcoHarmony West has materially complied, and the Project is in material compliance, with all Laws applicable to them, except for such violations or noncompliance which would not reasonably be expected to have a Material Adverse Effect.

3.11    Books and Records.  The limited liability company books and records of EcoHarmony West have been made available to Buyer and are complete and correct in all material respects.  All of the limited liability company books and records of EcoHarmony West will be delivered to Buyer promptly after the Closing Date.

3.12    Material Contracts.

(a)     Section 3.12 of the Seller Disclosure Schedule sets forth a list of each Contract to which EcoHarmony West is a party and that is material to the business of EcoHarmony West (the "Material Contracts").

(b)     Each of the Material Contracts is in full force and effect in all material respects and constitutes a legal, valid and binding obligation of EcoHarmony West and, to the Knowledge of such Seller, of any other party thereto, except as such validity and/or enforceability may be limited by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar Laws affecting creditors' rights generally and by general equitable principles (regardless of whether enforceability is considered in an Action in equity or at law).

(c)     Neither EcoHarmony West nor to such Seller's Knowledge, any other party to a Material Contract, is in material breach of such contract or is not capable of performing its obligations thereunder in all material respects and, to the Knowledge of such Seller, EcoHarmony West has not received any notice of termination or breach of any Material Contract.

(d)     Neither EcoHarmony West nor any other party, has received any notice from or been charged by any Governmental Authority or other Person regarding such Seller's or any other party's performance under any Material Contract violating or failing to comply with any material Laws relating to the Project or EcoHarmony West.

3.13    Litigation.  Except as set forth in Section 3.13 of the Seller Disclosure Schedule, as of the date hereof, there are no pending or, to the Knowledge of such Seller, threatened Actions against such Seller or EcoHarmony West (i) relating to EcoHarmony West's assets or

(ii) which would reasonably be expected to result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the other Transaction Documents.

3.14   Employees.  EcoHarmony West does not have and never has had any employees. Neither such Seller nor any of its Affiliates, including EcoHarmony West, is a party to or is bound by any collective bargaining agreement with respect to any employees assigned to the Project and, to such Seller's Knowledge, no union organizing efforts are currently underway with respect to any such employees and no Action has been commenced by any union as to the representation of such employees.

3.15   Taxes.  Except as set forth in Section 3.15 of the Seller Disclosure Schedule:

(a)    Tax Returns Filed.   (i) all Tax Returns required to be filed with respect to EcoHarmony West have been timely filed or a valid election has been made to extend the time for filing; (ii) all such Tax Returns are true, correct and complete in all material respects; and (iii) all Taxes required to be shown on such Tax Returns or otherwise due have been timely paid.

(b)    No Known Claims.  There are no suits, Actions, investigations, inquiries pending or, to the Knowledge of such Seller, threatened against EcoHarmony West in respect of Taxes. The Tax Returns of EcoHarmony West have not been audited by any Tax authority and are not in the process of being audited, and there is no Tax deficiency outstanding, proposed or assessed against EcoHarmony West.

3.16   Environmental Matters; Project Permits.   To the Knowledge of such Seller, EcoHarmony West has been in compliance with all applicable Environmental Laws with respect to the Project, except for such noncompliance that would not reasonably be expected to have a Material Adverse Effect on EcoHarmony West or the Project.  Except as set forth in Section 3.16 of the Seller Disclosure Schedule:

(a)    Copies Provided.   Sellers have furnished or made available to Buyer true and correct copies of all material environmental site assessments in its possession with respect the Site.   There have been no other material environmental site assessments with respect to Hazardous Substances relating to the Site.

(b)    No Known Claims.   There are no pending or, to the Knowledge of such Seller, threatened claims, demands, Actions or investigations against EcoHarmony West (i) under any Environmental Law or (ii) in connection with any Project Permits which seek or may result in their reversal, rescission, termination, modification or suspension, and, except as set forth in Section 3.16(b) of the Seller Disclosure Schedule, neither EcoHarmony West nor anyone acting on its behalf has received notice of any material violation of any such Project Permits, except for any such violation which has been or is being addressed as set forth in such Schedule.

(c)    Approvals in Force.   Section 3.16(c) of the Seller Disclosure Schedule lists all Project Permits currently in force to develop EcoHarmony West in compliance with Environmental Laws and other Laws in light of its current stage of development.  Except as set forth in Section 3.16(c) of the Seller Disclosure Schedule and except as would not reasonably be expected to have a Material Adverse Effect, EcoHarmony West has obtained such listed Project Permits and each such Project Permit is in full force and effect.

(d)     No Violations.  Except as set forth in Section 3.16(d) of the Seller Disclosure Schedule, (i) EcoHarmony West has not Released in, on, under, or about the Site, or transported thereto or therefrom, any Hazardous Substances that could reasonably be expected to subject EcoHarmony West to material liability under any Environmental Law; (ii) to the Knowledge of such Seller, without investigation, there are no underground tanks, whether operative or temporarily or permanently closed, located on the Site; and (iii) there are or have been no violations of Environmental Laws that will or have resulted in any material investigation, reporting or remediation obligations or other response action under any Environmental Laws, except, in each case, where such violations would not reasonably be expected to have a Material Adverse Effect.

(e)     No Hazardous Substances.  Since November 30, 2011, to the Knowledge of such Seller, there has been no exposure of any Person or property to any Hazardous Substance in connection with the Project that could reasonably be expected to result in a material liability under any Environmental Laws.

(f)     Permits.  Section 3.16(f) of the Seller Disclosure Schedule sets forth all Project Permits that have been obtained by EcoHarmony West as of the date hereof.  Other than as set forth in Section 3.16(f) of the Seller Disclosure Schedule, to such Seller's Knowledge EcoHarmony West is in material compliance with all Project Permits that have currently been obtained and each such Project Permit is in full force and effect.  Neither such Seller nor EcoHarmony West has received any written notification from any Governmental Authority that it is or may be in material violation of any Project Permits.

Notwithstanding any provision in this Agreement to the contrary, the representations and warranties in this Section 3.16 are the sole and exclusive representations relating to environmental matters (including but not limited to those related to Environmental Laws and Hazardous Substances), Governmental Approvals and Project Permits.  Such Seller makes no representation or warranty regarding any compliance or failure to comply with, or any actual or contingent liability under, any Environmental Law, except as expressly set forth in this Section 3.17.

3.17     Governmental Approvals.  No Governmental Approval will be required to be obtained by EcoHarmony West from the MPUC or any other Governmental Authority in connection with the transactions contemplated in this Agreement.

3.18     Investment Company.  Such Seller is not an "investment company" or a company "controlled" by an investment company within the meaning of the Investment Company Act of 1940.

3.19     Brokers' Fees.  Such Seller does not have any liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement, other than with respect to any fees or commissions which shall be due and payable at Closing and which shall be paid by such Seller at the Closing from the Purchase Price proceeds.

3.20     Wind Data.  Such Seller has delivered to Buyer true and correct copies of the wind data reports prepared by the Wind Engineer and specified on Section 3.20 of the Seller Disclosure Schedule (such reports the "Wind Data Documents").

### 3.21 Disclaimer of Other Representations and Warranties.

(a) EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE III, THE TRANSACTION DOCUMENTS AND EACH OF THE CERTIFICATES, SCHEDULES OR OTHER DOCUMENTS EXECUTED AND DELIVERED BY SELLERS ON THE CLOSING DATE, SELLERS MAKE NO REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AND WHETHER BY COMMON LAW, STATUTE, OR OTHERWISE AS TO ECOHARMONY WEST OR THE PROJECT, THE DEVELOPMENT, CONSTRUCTION OR OPERATIONS OF THE PROJECT, OR THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF ECOHARMONY WEST OR THE PROJECT INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO THE ACTUAL GENERATING CAPABILITY OF THE PROJECT OR THE ABILITY OF BUYER TO GENERATE OR SELL ELECTRICAL ENERGY.

(b) WITHOUT LIMITING THE FOREGOING, AND EXCEPT FOR THOSE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE III, THE TRANSACTION DOCUMENTS, AND EACH OF THE CERTIFICATES, SCHEDULES OR OTHER DOCUMENTS EXECUTED AND DELIVERED BY SELLERS AT THE CLOSING, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES OF MERCHANTABILITY, USAGE OR SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE PROPERTIES OR ASSETS OF ECOHARMONY WEST OR THE PROJECT, OR ANY PART THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, OR COMPLIANCE OF SUCH PROPERTIES OR ASSETS WITH ANY LAWS, INCLUDING ENVIRONMENTAL LAWS, OR AS TO THE CONDITION OF THE PROPERTIES OR ASSETS OF ECOHARMONY WEST WIND FARM, ECOHARMONY WEST, OR ANY PART THEREOF, OR AS TO THE ABSENCE OF HAZARDOUS SUBSTANCES OR LIABILITY OR POTENTIAL LIABILITY UNDER ENVIRONMENTAL LAWS WITH RESPECT TO THE PROJECT OR ECOHARMONY WEST. ANY SUCH REPRESENTATIONS AND WARRANTIES ARE EXPRESSLY DISCLAIMED.

(c) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS ARTICLE III, THE PROPERTIES AND ASSETS OF ECOHARMONY WEST AND THE INTERESTS ARE SOLD "AS IS, WHERE IS" ON THE CLOSING DATE, AND IN THEIR CONDITION ON THE CLOSING DATE "WITH ALL FAULTS."

(d) WITHOUT LIMITING THE FOREGOING, NO MATERIAL OR INFORMATION PROVIDED BY, FURNISHED OR COMMUNICATIONS BY SELLERS OR THEIR REPRESENTATIVES (ORALLY OR IN WRITING), INCLUDING, WITHOUT LIMITATION, ANY INFORMATION, MATERIAL, PROJECTION OR ADVICE CONTAINED IN THE DUE DILIGENCE MATERIALS OR PROVIDED TO BUYER BY ANY MEMBER, DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF SELLERS OR ANY AFFILIATES THEREOF WILL CAUSE OR CREATE ANY WARRANTY, EXPRESS OR IMPLIED, AS TO THE TITLE, CONDITION, VALUE OR QUALITY OF THE ECOHARMONY WEST WIND FARM OR ECOHARMONY WEST.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the disclosure schedule delivered by Buyer to Sellers prior to the execution of this Agreement, including the documents attached to or delivered together with such disclosure schedule (the "Buyer Disclosure Schedule"), Buyer hereby represents and warrants to Sellers as follows:

4.1 <u>Organization.</u> Buyer: (i) is a limited liability company duly organized and validly existing under the Laws of the State of Delaware, (ii) is duly authorized to conduct business and is in good standing under the Laws of each jurisdiction where such qualification is required and (iii) has the requisite limited liability company power and authority to conduct its business as it is now conducted and to own its properties and assets.

4.2 <u>Authorization.</u> Buyer has the requisite limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby, including to purchase (pursuant to this Agreement) the Interests. The execution and delivery by Buyer of this Agreement and the other Transaction Documents and the performance by Buyer of its obligations hereunder and thereunder, have been duly and validly authorized by the requisite corporate action on the part of Buyer.

4.3 <u>Enforceability.</u> This Agreement has been duly and validly executed and delivered by Buyer and constitutes, and upon the execution and delivery by Buyer of the other Transaction Documents, such Transaction Documents will constitute (in each case assuming the due and valid execution and delivery by each other party hereto and thereto), its valid and legally binding obligation, enforceable against it in accordance with its terms and conditions, subject, however, to the effects of bankruptcy, insolvency, reorganization, arrangement, moratorium or similar Laws affecting creditors' rights generally, to general principles of equity (regardless of whether such enforceability is considered in an Action in equity or at law).

4.4 <u>Noncontravention.</u> The execution and delivery by Buyer of this Agreement does not, and the execution and delivery of each of the other Transaction Documents by Buyer and performance by Buyer of its obligations under this Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby will not: (i) conflict with or result in a violation of any Law applicable to Buyer; (ii) conflict with or result in a violation of any provision of the organizational documents of Buyer; or (iii) conflict with, result in a breach of, constitute a default under, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer, as applicable, is a party or by which it is bound or to which any of its assets is subject. Except as set forth on Section 4.4 of the Buyer Disclosure Schedule (the "Buyer Consents"), no consent, filing, notice, authorization, or approval of any Governmental Authority or other Person on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any of the other Transaction Documents or the consummation of the transactions contemplated hereby or thereby.

4.5 <u>Legal Proceedings.</u> There are no Actions pending or, to Buyer's Knowledge, threatened against Buyer or any of its assets and properties which would reasonably be expected to result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making

illegal the consummation of any of the transactions contemplated by this Agreement or any of the other Transaction Documents.

4.6 <u>Bankruptcy</u>. There is no bankruptcy, reorganization, or insolvency Action pending against, being contemplated by or threatened against Buyer.

4.7 <u>Not a Public Utility or Investment Company; Exon-Florio</u>. Buyer is not, and is not controlled by, a "public utility," a "public utility company," an "electric utility," an "electric utility company" or a "holding company" within the meaning of PUHCA, FPA or PURPA, or subject to state Laws or regulations respecting the rates or the financial or organizational regulation of electric utilities. Buyer is not an "investment company" or a company "controlled" by an investment company within the meaning of the Investment Company Act of 1940. Buyer is not deemed a "foreign person" for purposes of Section 721 of the Defense Production Act of 1950, as amended, or any executive orders, rules or regulations relating thereto.

4.8 <u>Accredited Investor; Investment</u>. Buyer is an "accredited investor" within the meaning of Regulation D under the Securities Act, and the rules and regulations promulgated thereunder. Buyer acknowledges that none of the Interests has been, or are contemplated to be, registered under any federal, state or local or international securities Laws (collectively, "Securities Law"), and may not be resold unless permitted under applicable exemptions contained in the Securities Laws or upon satisfaction of the registration or qualification requirements of the Securities Laws. Buyer acknowledges and agrees that it must bear the economic risk of its investments under this Agreement for an indefinite period of time since such investments have not been registered or qualified under the Securities Laws, and, therefore, cannot be sold unless it is subsequently registered or exemptions from registration or qualification are available. Buyer is not acquiring such investments with a view to, or for sale in connection with, any distribution thereof within the meaning of the Securities Act. Buyer, together with its members, managers, directors and executive officers and advisors, is familiar with investments of the nature of the investments contemplated under this Agreement, understands that these investments involve substantial risks, has adequately investigated the Project and EcoHarmony West, and has substantial knowledge and experience in financial and business matters, including, without limitation, electric power (including wind energy) production projects, such that it is capable of evaluating, and has evaluated, the merits and risks inherent in entering into the transactions contemplated under this Agreement and the other Transaction Documents, and is able to bear the economic risks of such investment.

4.9 <u>Brokers' Fees</u>. All negotiations relative to this Agreement and the transactions contemplated hereby have been carried out by Buyer directly with Sellers without the intervention of any Person on behalf of Buyer in such manner as to give rise to any valid Action by any Person against Sellers or any of their Affiliates for a finder's fee, brokerage commission or similar payment.

4.10 <u>Funding</u>. Buyer has, and at the Closing will have, liquid capital, available lines of credit or other committed sources of funds to enable it to pay the Purchase Price on the Closing Date and any other amounts payable pursuant to this Agreement and to perform all of its other obligations under this Agreement and the other Transaction Documents.

4.11 <u>Due Diligence Investigation and Other Acknowledgements</u>. Buyer acknowledges and agrees that it has fully and independently conducted its due diligence and, in consummating the transactions contemplated by this Agreement and the other Transaction Documents, is

relying exclusively upon: (i) the representations and warranties of Sellers contained in Article 3 of this Agreement, in the Transaction Documents and the certificates, Schedules and other documents executed and delivered by Sellers under this Agreement and the other Transaction Documents, and (ii) its own independent due diligence, including its inspections and investigations, as to the condition and suitability of the Site, EcoHarmony West and the Project, Liabilities, results of operations, condition (financial or otherwise) and prospects of EcoHarmony West and the Project. Buyer is generally familiar with the federal, state and local statutes, Laws, rules and regulations applicable to EcoHarmony West and the Project and Buyer has the expertise necessary to independently evaluate the condition, operation, suitability, performance and prospects of EcoHarmony West and the Project. Buyer acknowledges and agrees that it has reviewed and accepted the disclaimers set forth in Section 3.21 of this Agreement.

## ARTICLE 5
## CONDITIONS TO OBLIGATIONS TO CLOSE

5.1    Conditions to Obligation of Buyer.   The obligations of Buyer hereunder to purchase the Interests and consummate the transactions to be performed by it in connection with the Closing are subject to the satisfaction, at or before the Closing, of the following conditions (all or any of which may be waived in whole or in part by Buyer in its sole discretion):

(a)    Representations and Warranties.  The representations and warranties of Sellers set forth in Article 3 above shall be true and correct on and as of the Closing Date as though made on and as of the Closing Date except to the extent such representations and warranties were made as of a specified date (in which case they shall be true and correct as of such earlier date) and except for such breaches that, in the aggregate, would not be reasonably be expected to have a Material Adverse Effect;

(b)    Performance of Covenants.  Sellers shall have performed and complied with all of the covenants and obligations required by this Agreement to be so performed or complied with by Sellers at or before the Closing;

(c)    No Injunction.  There shall not be (i) any Order or Law in effect or any Action pending or threatened against any Party or the Project preventing, or which seeks to prevent, the consummation of any of the transactions contemplated by this Agreement or (ii) any Order or Law deemed applicable to such transactions, by any Governmental Authority of competent jurisdiction over the Parties, which would render the purchase and sale contemplated hereby to be illegal;

(d)    Delivery of Certificate.  Sellers shall have delivered to Buyer a certificate, reasonably satisfactory in form and substance to Buyer, dated as of the Closing Date and executed by an officer of Sellers to the effect that each of the conditions specified above in Sections 5.1(a) through 5.1(c) (inclusive) is satisfied in all respects;

(e)    Certificate of Incumbency.  Sellers shall have delivered to Buyer a certificate of incumbency, reasonably satisfactory in form and substance to Buyer, dated as of the Closing Date, as to the officers, members or managers, as applicable, and other personnel of Sellers executing this Agreement and any certificate, instrument or other Transaction Document to be delivered by Sellers at the Closing;

(f)    Consents and Approvals.  All Buyer Consents and Seller Consents shall have been duly obtained, made or given and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any Governmental Authority necessary for the consummation of the transactions contemplated by this Agreement and the other Transaction Documents shall have occurred;

(g)    Closing Deliverables.  Sellers shall have delivered, or caused to be delivered, to Buyer the documents and other things specified in Section 2.3(a) above;

(h)    Certificate of Good Standing.  Buyer shall have received certificates of good standing with respect to Sellers and EcoHarmony West, respectively, each as of a recent date, issued by the Secretary of State of the applicable jurisdiction of organization; and

(i)    Resignations.  Buyer shall have received written instruments of resignation from each of the officers and directors of EcoHarmony West, effective as of the Closing.

5.2    Conditions to Obligation of Sellers.  The obligations of Sellers hereunder to sell the Interests and consummate the transactions to be performed by it in connection with the Closing are subject to the satisfaction, at or before the Closing, of the following conditions (all or any of which may be waived in whole or in part by Sellers in their sole discretion):

(a)    Representations and Warranties.  The representations and warranties of Buyer set forth in Article 4 above shall be true and correct in all material respects on and as of the Closing Date as though made on and as of the Closing Date or, in the case of representations and warranties made as of a specified date, on and as of such date;

(b)    Performance of Covenants.  Buyer shall have performed and complied with all of the covenants and obligations required by this Agreement to be so performed or complied with by Buyer at or before the Closing;

(c)    No Injunction.  There shall not be (i) any Order or Law in effect or any Action pending or threatened against any Party of the Project preventing, or which seeks to prevent, the consummation of any of the transactions contemplated by this Agreement or (ii) any Order or Law deemed applicable to such transactions, by any Governmental Authority of competent jurisdiction over the Parties, which would render the purchase and sale contemplated hereby to be illegal;

(d)    Delivery of Certificate.  Buyer shall have delivered to Sellers a certificate, reasonably satisfactory in form and substance to Sellers, dated as of the Closing Date and executed by an officer of Buyer to the effect that each of the conditions specified above in Sections 5.2(a) through 5.2(c) (inclusive) is satisfied in all respects;

(e)    Certificate of Incumbency.  Buyer shall have delivered to Sellers a certificate of incumbency, reasonably satisfactory in form and substance to Sellers, dated as of the Closing Date, as to the officers and other personnel of Buyer executing this Agreement and any certificate, instrument or other Transaction Document to be delivered by Buyer at the Closing;

(f)    Consents and Approvals.  All Buyer Consents and Seller Consents shall have been duly obtained, made or given and shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any Governmental Authority necessary for the

consummation of the transactions contemplated by this Agreement and the other Transaction Documents shall have occurred; and

(g)  Closing Deliverables.  Buyer shall have delivered, or caused to be delivered, to Sellers the documents and other things specified in Section 2.3(b) above, including the purchase price.

## ARTICLE 6
## INDEMNIFICATION

6.1  Survival.

(a)  The representations and warranties of the Parties in this Agreement shall survive the Closing Date as follows:

(i)  the representations and warranties of Sellers set forth in Section 3.1 (Organization, Qualification and Power), Section 3.2 (Authorization), Section 3.3 (Enforceability), Section 3.6 (Limited Purpose Entity), Section 3.7 (Ownership), Section 3.14 (Employees), Section 3.19 (Brokers' Fees) and Section 3.21 (Disclaimer of Other Representations and Warranties) (collectively, the "Seller Fundamental Representations and Warranties") shall survive until the expiration of any statute of limitations applicable to any such Seller Fundamental Representations and Warranties; all other representations and warranties of Sellers shall survive until the date that is six months after the Closing Date.

(ii)  the representations and warranties of Buyer set forth in Section 4.1 (Organization, Qualification and Power), Section 4.2 (Authorization), Section 4.3 (Enforceability), Section 4.6 (Bankruptcy), Section 4.7 (Not a Public Utility or Investment Company; Exon-Florio), Section 4.8 (Accredited Investor; Investment), Section 4.9 (Brokers' Fees) and Section 4.11 (Due Diligence Investigation and Other Acknowledgments) (collectively, the "Buyer Fundamental Representations and Warranties") shall survive until the expiration of any statute of limitations applicable to any such Buyer Fundamental Representations and Warranties; all other representations and warranties of Buyer shall survive until the date that is six months after the Closing Date.

(b)  The covenants and obligations of the Parties set forth in this Agreement (including, without limitation, the indemnity obligations of the Parties) shall survive the Closing Date until fully performed in accordance herewith, unless otherwise provided herein.

6.2  Indemnification by Seller.  From and after the Closing, subject to the other terms and limitations in this Agreement, Sellers shall defend, indemnify and hold harmless Buyer and its Affiliates, and their respective directors, officers, partners, members, employees, consultants, agents, advisors, successors and assigns (collectively, the "Buyer Indemnified Persons"), from and against any and all Losses asserted against or incurred by any of the Buyer Indemnified Persons for (i) any breach of Sellers' representations or warranties made in this Agreement and (ii) any breach of the covenants or obligations of Sellers under this Agreement.

6.3  Indemnification by Buyer.  From and after the Closing, subject to the other terms and limitations in this Agreement, Buyer shall defend, indemnify and hold harmless Sellers and their Affiliates, and their respective directors, officers, partners, members, employees, consultants, agents, advisors, successors and assigns (collectively, the "Seller Indemnified

Persons"), from and against any and all Losses asserted against or incurred by any of the Sellers Indemnified Persons for (i) any breach of Buyer's representations or warranties made in this Agreement, and (ii) any breach of the covenants or obligations of Buyer under this Agreement.

6.4     Limitations on Indemnity. (a) Notwithstanding anything to the contrary contained herein, none of the Buyer Indemnified Persons shall be entitled to assert any right to indemnification under Section 6.2 until the aggregate amount of all Losses actually suffered by the Buyer Indemnified Persons exceeds $100,000 (the "Deductible Amount") (after which point Sellers shall be obligated only to indemnify the Buyer Indemnified Persons from and against any further Losses in excess of the Deductible Amount; *provided, however*, that individual Actions of $25,000 or less shall not be included or aggregated for purposes of calculating either the Deductible Amount or the amount of any Losses in excess of the Deductible Amount. Notwithstanding the foregoing, an Indemnified Party shall have no right against an Indemnifying Party with respect to a breach of a representation or warranty if, at the time of Closing, the Indemnified Party knew of the misrepresentation or breach of warranty.

(b)     The maximum aggregate liability of Sellers to Buyer Indemnified Persons under this Agreement shall not exceed an amount equal to the purchase price then paid pursuant to Section 2.1.

(c)     Sellers' liability hereunder shall be several and not joint. EcoEnergy shall be liable for only 99.0% of any Losses and Morse Energy shall be liable for only 1.0% of any Losses.

6.5     Mitigation and Limitations on Losses.

(a)     Mitigation. In no event shall Sellers be liable hereunder for any special, punitive, exemplary, incidental or consequential damages or damages calculated by reference to any multiple of earnings or earnings before interest, tax, depreciation or amortization (or any other valuation methodology), whether based on contract, tort, strict liability, other Law or otherwise and whether or not arising from the other Party's sole, joint or concurrent negligence, strict liability or other fault for any matter relating to this Agreement and the transactions contemplated hereby. The Indemnified Party shall take all commercially reasonable steps to mitigate all Losses upon becoming aware of any event which could reasonably be expected to give rise thereto, including availing itself of any defenses, limitations, rights of contribution, Actions against third Persons and other rights at Law or equity, and will provide such evidence and documentation of the nature and extent of the Losses as may be reasonably requested by the Indemnifying Party. The Indemnified Party's commercially reasonable steps include the reasonable expenditure of money to mitigate or otherwise reduce or eliminate any Losses for which indemnification would otherwise be due under this Article 6. In the event of any obligation or liability of an Indemnifying Party under this Article 6 that does not arise from a Third Party Claim, upon receipt of written notice, the Indemnifying Party shall be permitted, at its option, to take action to cure any matter giving rise to a right of indemnification if the Loss has not yet been fully incurred for a period not to exceed thirty (30) days after such notice. The Indemnifying Party's election not to exercise its right to cure shall not reduce or eliminate the Indemnified Party's obligation to mitigate damages or the Indemnifying Party's obligation to indemnify the Indemnified Party for any Losses.

(b)     Limitation on Losses. The Losses giving rise to any indemnification obligation hereunder shall be limited to the actual loss suffered by the Indemnified Party (i.e., reduced by

any insurance proceeds or other payment or recoupment actually received, realized or retained by the Indemnified Party as a result of the events giving rise to an Action for indemnification), net of the actual reduction in income Tax liability of the Indemnified Party (or the Affiliated Group of which it is a member) occasioned by such loss or damage, but including any costs, fees or expenses reasonably incurred by the Indemnified Party and an amount equal to any increase in income Tax liability of the Indemnified Party (or the Affiliated Group of which it is a member) occasioned by the indemnity payment. Upon the request of the Indemnifying Party, the Indemnified Party shall provide the Indemnifying Party with information sufficient to allow the Indemnifying Party to calculate the amount of the indemnity payment in accordance with this Section 6.5. If and to the extent that an Indemnifying Party has made an indemnification payment to an Indemnified Party pursuant to this Section 6.5 with respect to a Loss and the Indemnified Party has been and will be fully indemnified and compensated for such Loss from a Party other than the Indemnifying Party, the Indemnified Party shall pay to the Indemnifying Party: (i) the amount of any payment irrevocably received by the Indemnified Party or any Affiliate thereof from a party other than the Indemnifying Party with respect to such Loss, and (ii) the amount of any insurance proceeds or other cash receipts actually received by the Indemnified Party or any of the Indemnified Party's Affiliates with respect to such Loss or the matter that gave rise to the Loss, such amounts described in subparagraphs (i) and (ii) above shall be net of reasonable attorneys' fees and other collection costs related to such payments and recoveries, and no right of subrogation shall accrue to any insurer hereunder. In no event shall an Indemnified Party be required to pay over, under this Section 6.5, an amount in the aggregate in excess of the indemnity payment previously payable to the Indemnifying Party with respect to the Losses in issue.

### 6.6 Matters Involving Third Parties.

(a) Third Party Claims. If any third party shall notify an Indemnified Party with respect to any matter (a "Third Party Claim") that may give rise to an Action for indemnification against an Indemnifying Party under this Article 6, and if such Indemnified Party intends to seek indemnity with respect thereto hereunder, then such Indemnified Party shall promptly (and in any event within five (5) business days after receiving notice of the Third Party Claim) notify the Indemnifying Party of such Third Party Claim in writing.

(b) Right to Assume Defense. The Indemnifying Party shall have forty-five (45) days after receipt of such notice to elect to undertake, conduct and control the defense or settlement of the Third Party Claim (with counsel of its choice and at its own expense); *provided, however*, that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party, which consent shall not to be unreasonably withheld or delayed, unless the judgment or proposed settlement (i) involves only the payment of money damages, and (ii) does not impose an Order or other equitable relief upon the Indemnified Party or otherwise prejudice the Indemnified Party as to similar Actions in the future. The Indemnifying Party shall keep the Indemnified Party fully informed as to all material developments in connection with the Third Party Claim.

(c) Right to Defend. So long as the Indemnifying Party, at the Indemnifying Party's cost and expense, (1) has undertaken the defense of, and assumed full responsibility for, all indemnified Liabilities with respect to such Third Party Claim; (2) is reasonably contesting such Third Party Claim in good faith, by appropriate Actions; and (3) has taken such action (including

the posting of a bond, deposit, or other security) as may be necessary to prevent any Action to foreclose a lien against or attachment of the property of the Indemnified Person for payment of such Third Party Claim, the Indemnified Person shall not pay any claim arising from or settle any such Action. If the Indemnifying Party fails, within forty-five (45) days after the receipt of the Indemnified Person's notice of an Action for indemnity hereunder, to notify the Indemnified Person that the Indemnifying Party elects to undertake the defense thereof and assume full responsibility for all indemnified Liabilities with respect thereto, or fails, at any time after having given such notice, to contest such Action in good faith or to prevent any Action to foreclose a lien against or attachment of the Indemnified Person's property as contemplated above, the Indemnified Person shall have the right to contest, settle, or compromise such Action and the Indemnified Person shall not thereby waive any right to indemnity for such Action under this Agreement.

(d)     No Settlement. In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed, unless the Indemnifying Party waives any indemnification Action with respect to the Third Party Claim as set forth in Section 6.6(c) above.

## ARTICLE 7
## CERTAIN INTERIM COVENANTS

7.1     Continued Development of the Project. From the date of this Agreement through the Closing, Sellers shall, and shall cause EcoHarmony West to (i) continue the development, planning and permitting of the Project, as appropriate, in accordance with Sellers' regular business practices for other similar projects and the terms and condition of this Agreement, (ii) regularly communicate with Buyer in order to allow Buyer the opportunity to become informed with respect to such continued development, (iii) take only such actions as are reasonably necessary or appropriate to complete construction of the Project and the consummation of the transactions contemplated by this Agreement and the other Transaction Documents.

7.2     Efforts to Close. Each of the Parties shall (i) use its reasonable best efforts to take all actions and to do all things necessary, proper, or advisable, and proceed diligently and in good faith, as promptly as practicable, to obtain all consents (including the Seller Consents and the Buyer Consents), approvals or actions of, to make all filings with, and to give all notices to, Governmental Authorities, (ii) provide such other information and communications to such Governmental Authorities or other Persons as such Governmental Authorities or other Persons may reasonably request in connection therewith, and (iii) provide reasonable cooperation to each other in obtaining all consents, approvals or actions of, making all filings with and giving all notices to Governmental Authorities or other Persons, in each case, as required of each of them, respectively, to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Documents as promptly as practicable. Prior to making any filings with a Governmental Authority pursuant to this Section 7.2, each Party agrees to provide the other Party with a reasonable opportunity to review and provide prior comment upon any written notices, filings or other submissions which such Party plans to deliver or submit to any Governmental Authority. Each Party shall provide prompt notification to the other Party when any consent, approval, action, filing or notice referred to in clause (i) of this Section 7.2 is obtained, taken, made or given, as applicable, and shall promptly provide the other Party with copies of any communications sent or delivered to, or received from, any Governmental

Authority or other Person(s) regarding any of the transactions contemplated by the Transaction Documents.

7.3    Satisfaction of Conditions.    The Parties shall take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy their respective conditions to the obligations contained in this Agreement and shall not take or fail to take any action that would reasonably be expected to result in the nonfulfillment of any such condition.

7.4    Transfer Taxes.    Buyer will pay all sales, use, transfer, real property transfer, recording, stock transfer and other similar Taxes and fees, if any, arising out of or in connection with the sale of the Interests and the consummation of the transactions contemplated by this Agreement, and will indemnify, defend and hold harmless Sellers and their Affiliates with respect to such Taxes. Buyer will file all necessary documentation and Tax Returns with respect to such Taxes.

7.5    Notice of Developments.

(a)    Prior to the Closing, each Party will advise the other in writing with respect to any matter arising after the date of this Agreement of which that Party obtains Knowledge and that, if existing or occurring on or prior to the date of this Agreement, would have been required to be set forth in this Agreement or any Schedule. Sellers shall provide Buyer with notice of any event or circumstance related to the transactions contemplated by this Agreement having a Material Adverse Effect promptly upon having Knowledge of such event or circumstance.

(b)    Sellers will from time to time prior to the Closing, promptly supplement or amend the Seller Disclosure Schedule with respect to any matter: (i) that existed as of the date of this Agreement and should have been set forth or described in the Seller Disclosure Schedule or (ii) arising after the date of this Agreement, which if existing as of the date of this Agreement, would have been required to be set forth or described in the Seller Disclosure Schedule in order to make any representation or warranty set forth in this Agreement true and correct as of such date. If the matters disclosed on such supplemented or amended Seller Disclosure Schedule have or would reasonably be expected to have a Material Adverse Effect on EcoHarmony West or the Project, then Buyer may, within ten (10) days after receipt of the supplemented or amended Seller Disclosure Schedule, deliver a written notice to Sellers terminating this Agreement in accordance with Section 9.1(e) (such notice a "Buyer Termination Notice"); *provided, however,* that:

(x) if Buyer delivers a Buyer Termination Notice within such ten (10) day period, then: (1) the termination specified therein shall be effective thirty (30) days after receipt by Sellers of the foregoing Buyer Termination Notice, (2) during such thirty (30) day period Sellers shall have the right (but not the obligation) to cure the event causing the amended or supplemented Seller Disclosure Schedule, and (3) if such event is cured, the Buyer Termination Notice (and the termination specified therein) shall be null and void, and (A) Buyer will be deemed to have accepted such supplement or amendment, and (B) such supplement or amendment will be deemed to supplement or amend the Seller Disclosure Schedule; and

(y) if Buyer does not deliver a Buyer Termination Notice within such ten (10) day period, then: (1) Buyer will be deemed to have forever waived any right to terminate this Agreement based upon such supplement or amendment, (2) Buyer will be deemed to

have accepted such supplement or amendment, and (3) such supplement or amendment will be deemed to supplement or amend the Seller Disclosure Schedule.

7.6    Casualty Events.

(a)    If, after the date of this Agreement and prior to the Closing, all or any material portion of the assets and properties of the Project (i) is condemned or taken by eminent domain or is the subject of a pending or threatened condemnation or taking that has not been consummated, or (ii) is materially damaged or destroyed by fire or other casualty, then Sellers will notify Buyer promptly in writing of such fact. In the case of a condemnation or taking, Sellers will assign or pay, as the case may be, any net proceeds thereof to Buyer at the Closing. In the case of a fire or other casualty, Sellers will either restore such damage or assign the insurance proceeds therefor to Buyer at the Closing.

(b)    If such condemnation, taking, damage or destruction results in a Material Adverse Effect, Buyer and Sellers, as appropriate, will negotiate to resolve the loss resulting from such condemnation, taking, damage or destruction (and such negotiation will include the negotiation of a fair and equitable adjustment to the Purchase Price). If no such resolution can be agreed upon within sixty (60) days after Sellers have notified Buyer of such loss, then either Buyer or Sellers may terminate this Agreement pursuant to Section 9.1(e) of this Agreement.

7.7    Further Assurances. At any time or from time to time after the Closing, each Party will, upon the reasonable request of the other Party, execute and deliver any further instruments or documents, and exercise commercially reasonable efforts to take such further actions as may reasonably be required, to fulfill and implement the transactions contemplated by this Agreement and the Transaction Documents. After the Closing, and upon prior reasonable request, each Party shall exercise commercially reasonable efforts to cooperate with the other, at the requesting Party's expense (unless the requesting Party is entitled to indemnification for the requested action under Article 6 of this Agreement), in furnishing non-privileged records, information, testimony and other assistance in connection with any inquiries, actions, audits, proceedings or disputes involving any of the Parties (other than in connection with disputes between the Parties hereto) and based upon contracts, arrangements or acts of either Sellers or Buyer, which were in effect or occurred on, prior to, or after Closing and which relate to EcoHarmony West or the Project, including arranging discussions with (and calling as a witness) Representatives of Buyer or Sellers. No Party, however, will be required to take any action that, in the opinion of its counsel, could constitute a violation of any Law.

7.8    Securities Law Covenant. Buyer will not transfer or otherwise dispose of any of the Interests, or any interest in the Interests, in such manner as to cause Sellers or their Affiliates to be in violation of the registration requirements of the Securities Act, or applicable federal or state securities or blue sky Laws.

7.9    Announcements. Upon the execution of this Agreement, Buyer and Sellers shall cooperate to issue a press release or public announcement mutually satisfactory to each of them. Thereafter, no press release or other public announcement, or public statement or comment in response to any inquiry, relating to the transactions contemplated by this Agreement and the other Transaction Documents shall be issued or made by Sellers without Buyer's consent. The filings referenced in Section 7.2 shall not constitute any breach of this Section 7.9.

7.10 <u>Confidentiality</u>. Buyer acknowledges that the information being provided to it in connection with this Agreement and the consummation of the transactions contemplated hereby is subject to the terms of a confidentiality agreement between EcoEnergy, Gamesa Wind US, LLC and Buyer, dated as of [**DATE**], 2011 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate with respect to information relating solely to EcoHarmony West or the Project; *provided, however*, that Buyer acknowledges that any and all other information provided to it by Sellers or any Affiliate or Representative of Sellers shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date.

## ARTICLE 8
## TAX MATTERS

8.1 <u>Tax Periods Ending on or Before the Closing Date</u>. Sellers will prepare or cause to be prepared and file or cause to be filed all Tax Returns for EcoHarmony West for all periods ending on or prior to the Closing Date that are filed after the Closing Date and will pay or cause to be paid all Taxes shown due on such Tax Returns. Sellers will permit Buyer to review and comment on each such Tax Return described in the preceding sentence prior to filing and will make such revisions to such Tax Returns as are reasonably requested by Buyer. Sellers shall have the right to represent EcoHarmony West with respect to any tax claims or audits for tax periods ending on or before the Closing Date.

8.2 <u>Tax Periods Beginning Before and Ending After the Closing Date</u>. Buyer will prepare or cause to be prepared and file or cause to be filed any Tax Returns for EcoHarmony West for Tax periods that begin before the Closing Date and end after the Closing Date and will pay all Taxes shown due on such Tax Returns. Buyer will permit Sellers to review and comment on each such Tax Return described in the preceding sentence prior to filing and will make such revisions to such Tax Returns as are reasonably requested by Sellers. Sellers will pay to Buyer within fifteen (15) days after the date on which Buyer pays the Taxes shown due on the Tax Returns an amount equal to the portion of such payment that is attributable to Taxes for the portion of such Taxable period ending on the Closing Date (the "Pre-Closing Tax Period"). For purposes of this <u>Article 8</u>, in the case of any Taxes that are imposed on a periodic basis and are payable for a Taxable period that includes (but does not end on) the Closing Date, the portion of such Tax that relates to the Pre-Closing Tax Period will (a) in the case of any Taxes other than Income Taxes, be deemed to be the amount of such Tax for the entire Taxable period multiplied by a fraction the numerator of which is the number of days in the Taxable period ending on the Closing Date and the denominator of which is the number of days in the entire Taxable period, and (b) in the case of any Income Tax, be deemed equal to the amount that would be payable if the relevant Taxable period ended on the Closing Date. Any credits relating to a Taxable period that begins before and ends after the Closing Date will be taken into account as though the relevant Tax period ended on the Closing Date. All determinations necessary to give effect to the foregoing allocations will be made in a manner consistent with prior practice of EcoHarmony West. Notwithstanding any other provision of this Agreement, any Property Tax of EcoHarmony West shall not be prorated between Buyer and Sellers. Sellers shall have no Liability for any Property Taxes of EcoHarmony West due after the Closing Date. Buyer shall have the right to represent EcoHarmony West with respect to any tax claims or audits for tax periods ending after the Closing Date; *provided, however*, that with respect to Tax Claims or audits relating to a Pre-Closing Tax Period, (a) Sellers shall have the right to participate in such

representation, and b) Buyer shall not settle any such tax claims or audits without the consent of Sellers, which consent shall not be unreasonably withheld.

8.3     Refunds and Tax Benefits; Amended Tax Returns.  Any Tax refunds that are received by Buyer or EcoHarmony West and any amounts credited against Tax to which Buyer or EcoHarmony West become entitled, that relate to Tax periods or portions thereof ending on or before the Closing Date will be for the account of Sellers and Buyer will pay over to Sellers any such refund or the amount of any such credit within fifteen (15) days after receipt or entitlement thereto; *provided however*, that Buyer shall be entitled to any refund of Property Taxes of EcoHarmony West due after the Closing Date and paid by Buyer.  Without limiting the generality of the foregoing, this Section 8.3 will apply to any sales tax rebates and refunds, Property Tax exemption and credits or reductions in Property Taxes attributable to a retroactive reduction in assessment rate or assessment base.  No amended Tax Return or Action for Tax refund may be filed for any Tax Returns of EcoHarmony West for a Tax period ending on or before the Closing Date or for a Tax period including a Pre-Closing Tax Period without the advance written consent of Sellers.

8.4     Cooperation on Tax Matters.

(a)     The Parties will cooperate fully, as and to the extent reasonably requested by the other Party, in connection with the filing of Tax Returns pursuant to this Article 8 and any audit, litigation or other Action with respect to Taxes.  Such cooperation will include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other Action and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Parties agree (to the extent such books and records are within their possession) (i) to retain all books and records with respect to Tax matters pertinent to the Project relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer or Sellers, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (ii) to give the other party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other party so requests, Sellers will allow the other party to take possession of such books and records.

(b)     The Parties further agree, upon request, to use reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including without limitation with respect to the transactions contemplated by this Agreement).

## ARTICLE 9
## TERMINATION

9.1     Termination.     This Agreement may be terminated, and the transactions contemplated hereby may be abandoned at any time prior to Closing:

(a)     by mutual written consent of the Parties hereto;

(b)     by either Sellers or Buyer, in the event of the issuance of a final, non-appealable Order or Law restraining, enjoining, or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the other

Transaction Documents; *provided however,* that the right to terminate this Agreement under this Section 9.1(b) shall not be available to any Party if such Party is then in material breach of its representations, warranties or covenants hereunder;

(c) by either Buyer or Sellers upon written notice to the other in the event of a material breach of any representation, warranty or covenant contained in this Agreement on the part of the other Party, which breach (x) would result in, if occurring or continuing on the Closing Date, the failure of any condition to the terminating Party's obligations set forth in Article 5 to be satisfied, and (y) has not been cured within forty-five (45) days after the giving of written notice to the breaching Party of such breach; *provided, however,* that the right to terminate this Agreement under this Section 9.1(c) shall not be available to any Party if such Party is then in material breach of any of its representations, warranties or covenants hereunder, or whose failure to take any action required to fulfill any of such Party's obligations under this Agreement has caused or resulted in the failure of the Closing to occur prior to the Final Closing Date.

(d) by either Buyer or Sellers if no Closing has occurred on or before the Final Closing Date; *provided, however,* that the right to terminate this Agreement under this Section 9.1(d) shall not be available to any Party that is then in material breach of any of its representations, warranties or covenants under this Agreement, or whose failure to take any action required to fulfill any of such Party's obligations under this Agreement has caused or resulted in the failure of the Closing to occur prior to the Final Closing Date; or

(e) by Buyer, on the one hand, or by Sellers, on the other hand, upon written notice to the other Party, in accordance with the provisions of Section 7.5 or 7.6 of this Agreement, *provided, however,* that the right to terminate this Agreement under this Section 9.1(e) shall not be available to any Party that is then in material breach of its representations, warranties or covenants under this Agreement.

9.2    Effect of Termination.  In the event of termination of this Agreement pursuant to Section 9.1, written notice thereof shall promptly be given by the terminating Party to the other Party, this Agreement shall become null and void upon the effectiveness of such notice and there shall be no liability or obligation on the part of Sellers or Buyer, or any of their respective Representatives or Affiliates, as the case may be, except with respect to Section 2.3 (Security for Buyer Obligations), this Section 9.2 (Effect of Termination) and Article 10 (Miscellaneous), which shall continue to apply following any such termination; *provided, however,* that no termination of this Agreement shall relieve any Party of liability for breach of this Agreement occurring prior to termination.

### ARTICLE 10
### MISCELLANEOUS

10.1    No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

10.2    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Party.

10.3    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The delivery of an executed counterpart of this Agreement by facsimile transmission or other electronic means shall be deemed to be effective as manual delivery thereof.

10.4    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

10.5    Notices.  All notices, requests, demands, Actions, and other communications hereunder will be in writing.  Any notice, request, demand, or other communication hereunder shall be deemed duly given two Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:                                   EcoEnergy LLC
                                                2511 Technology Drive, Suite 110
                                                Elgin, IL  60123
                                                Attn:  Shawn Gaffney
                                                Facsimile:  (815) 266-8948
                                                Telephone: (815) 266-4248

                                                Morse Energy LLC
                                                2511 Technology Drive, Suite 110
                                                Elgin, IL  60123
                                                Attn:  Shawn Gaffney
                                                Facsimile:  (815) 266-8948
                                                Telephone: (815) 266-4248

with a copy, which shall not constitute notice, to:

                                                Pauline E. Doohan, Esq.
                                                One Prudential Center, Suite 3500
                                                Chicago, IL  60601
                                                Facsimile: (312) 698-2952
                                                Telephone: (312) 861-2811

If to Buyer:                                    Gamesa Energy USA, LLC
                                                Ten Penn Center
                                                1801 Market Street, Suite 2700
                                                Philadelphia, PA 19103
                                                Attn:  Chief Development Officer
                                                Phone:  215-665-9810
                                                Facsimile:  215-569-2801

with a copy, which shall not constitute notice, to:

Gamesa Technology Corporation
2050 Cabot Boulevard West
Langhorne, PA 19047
Attn: General Counsel
Phone: 215-710-3100
Facsimile: 215-689-3784

Any Party may send any notice, request, demand, Action, or other communication hereunder to the intended recipient at the addresses set forth above using any other means (including personal delivery, expedited courier, messenger service, facsimile, or ordinary mail), but no such notice, request, demand, Action, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient. Any Party may change the address to which notices, requests, demands, Actions, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

10.6    Governing Law; Forum; Submission to Jurisdiction. This Agreement shall be governed by and construed and enforced in accordance with the Laws of the State of New York without regard to the conflicts of laws provisions thereof. Each Party hereby submits to the nonexclusive jurisdiction of the United States District Court and the courts of the Commonwealth of Pennsylvania, in either case sitting in the city of Philadelphia, Pennsylvania for the purposes of all Actions arising out of or relating to this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby. Each Party irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.

10.7    WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

10.8    Expenses; Attorney's Fees. As between Buyer, on the one hand, and Sellers, on the other hand, each Party shall (except as otherwise expressly provided in this Agreement) be responsible for its own costs and expenses, including any legal fees, incurred in connection with this Agreement and the transactions contemplated hereby. If any Action arising out of or related to this Agreement is brought by either Party, the prevailing Party shall be entitled to recover the costs and fees (including, without limitation, reasonable attorneys' fees, the fees and costs of experts and consultants, copying, courier and telecommunication costs, and deposition costs and all other costs for discovery) incurred by such Party in such suit or Action, including, without limitation, any post-trial or appellate Action.

10.9    Amendments and Waivers. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Sellers. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

10.10  Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

10.11  Enforcement of the Agreement.  In the event of any default under this Agreement, or breach of any of the terms, conditions and provisions of this Agreement, the Party who is thereby aggrieved will have the right of specific performance and injunctive relief giving effect to its rights under this Agreement, in addition to any and all other rights and remedies at law or in equity, and all such rights and remedies will be cumulative.  The Parties agree that any such default or breach would cause irreparable injury, that the remedies at law for any such default or breach including monetary damages, are inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived.

10.12  Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

10.13  Incorporation of Exhibits and Schedules.  The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made an integral part hereof.

10.14  Entire Agreement.  This Agreement and the other Transaction Documents supersede all prior discussions and agreements between the Parties with respect to the subject matter hereof and thereof, and any prior confidentiality agreements executed by the Parties in respect of the transactions contemplated by this Agreement, and contain the sole and entire agreement between the Parties hereto with respect to the subject matter hereof and thereof, and there are no agreements, understandings, representations or warranties between the Parties other than those set forth herein or therein.

10.15  Time is of the Essence.  Time is of the essence of this Agreement.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

**SELLERS:**

**ECOENERGY, LLC,**
    an Illinois Limited Liability Company

By: _____
    Name: Shawn Gaffney
    Title: President

**MORSE ENERGY, LLC,**
    an Illinois Limited Liability Company

By: _____
    Name: Shawn Gaffney
    Title: President and Manager

**BUYER:**

**GAMESA ENERGY USA, LLC,**
    a Delaware Limited Liability Company

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

**SELLERS:**

**ECOENERGY, LLC,**
    an Illinois Limited Liability Company

By: _____
    Name:   Shawn Gaffney
    Title:    President

**MORSE ENERGY, LLC,**
    an Illinois Limited Liability Company

By: _____
    Name:    Shawn Gaffney
    Title:    President and Manager

**BUYER:**

**GAMESA ENERGY USA, LLC,**
    a Delaware Limited Liability Company

By: _____
    Name:  Jiddu Tapia
    Title:  Chief Development Officer

EXHIBIT  "B"

# EXHIBIT D
## [FORM OF] SECURITY AGREEMENT

This security agreement (this "Agreement") dated as of December __, 2011, is by and among Morse Energy, LLC, an Illinois limited liability company ("Morse"), EcoEnergy, LLC, an Illinois limited liability company ("EcoEnergy," together with Morse, the "Secured Parties"), Gamesa Energy USA, LLC, a Delaware limited liability company ("Buyer") and EcoHarmony West Wind LLC, a Minnesota limited liability company, ("EcoHarmony," and together with Buyer, the "Obligated Parties").

The Secured Parties and Buyer are parties to a membership interest purchase and sale agreement dated as of December [•], 2011 (the "MIPSA"), under which Buyer agreed to buy and the Secured Parties agreed to sell, 100% of the membership interests of EcoHarmony (the "Interests"). As a condition to closing of the purchase and sale of the Interests and the other transactions contemplated by the MIPSA, Buyer is required to deliver this Agreement executed by Buyer and EcoHarmony to grant a security interest in EcoHarmony and its assets to the Secured Parties as security for Buyer's obligations under the MIPSA.

The parties hereby agree as follows:

1. **Grant of Security Interest and Collateral.** In order to secure performance by Buyer of its obligations under the MIPSA (all such obligations and any amendments, extensions, renewals or replacements thereof are herein collectively referred to as the "Obligations"), (i) Buyer hereby grants to the Secured Parties a security interest (the "Buyer Security Interest") in the Interests to be held by Buyer immediately following the closing of the sale of Interests, and (ii) EcoHarmony hereby grants a security interest (the "EcoHarmony Security Interest," and together with the Buyer Security Interest, the "Security Interests") in all of EcoHarmony's property (together with the Interests, the "Collateral"), including the following:

    (a)    Inventory and Goods: All inventory of EcoHarmony, whether now owned or hereafter acquired and wherever located and other tangible personal property held for sale or lease or furnished or to be furnished under contracts of service or consumed in EcoHarmony's business, and all goods of EcoHarmony, whether now owned or hereafter acquired and wherever located, including without limitation all computer programs embedded in goods, and all other Inventory and Goods, as each such term may be defined in the Uniform Commercial Code as in effect in the state of Minnesota from time to time (the "UCC"), of the EcoHarmony, whether now owned or hereafter acquired;

    (b)    Equipment: All equipment of EcoHarmony, whether now owned or hereafter acquired and wherever located, including without limitation to all present and future equipment, machinery, tools, motor vehicles, trade fixtures, furniture, furnishings, office and recordkeeping equipment and all goods for use in EcoHarmony's business, and all other Equipment (as such term may be defined in the UCC) of the EcoHarmony, whether now owned or hereafter acquired, together with all parts, equipment and attachments relating to any of the foregoing;

(c)    Accounts, Contract Rights and Other Rights to Payment: Each and every right of EcoHarmony to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease, license, assignment or other disposition of goods or other property by EcoHarmony, out of a rendering of services by EcoHarmony, out of a loan by EcoHarmony, out of the overpayment of taxes or other liabilities of EcoHarmony, or otherwise arises under any contract or agreement, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and security interests) which EcoHarmony may at any time have by law or agreement against any account debtor or other obligor obligated to make any such payment or against any of the property of such account debtor or other obligor; all including without limitation all present and future debt instruments, chattel papers, accounts, license fees, contract rights, loans and obligations receivable and tax refunds, and all other Accounts (as such term may be defined in the UCC) of the EcoHarmony, whether now owned or hereafter acquired, and including interconnection queue rights;

(d)    Instruments: All instruments, chattel paper, letters of credit or other documents of EcoHarmony, whether now owned or hereafter acquired, including without limitation promissory notes, drafts, bills of exchange and trade acceptances; all rights and interests of EcoHarmony, whether now existing or hereafter created or arising, under leases, licenses or other contracts, and all other Instruments (as such term may be defined in the UCC) of the EcoHarmony, whether now owned or hereafter acquired;

(e)    Deposit Accounts and Investment Property: All right, title and interest of EcoHarmony in all deposit and investment accounts maintained with any bank, savings and loan association, broker, brokerage, or any other financial institution, together with all monies and other property deposited or held therein, including without limitation any checking account, savings account, escrow account, savings certificate and margin account, and all securities, whether certificated or uncertificated, security entitlements, securities accounts, commodity contracts, and commodity accounts, and all other Deposit Accounts and Investment Property (as each such term may be defined in the UCC) of the EcoHarmony, whether now owned or hereafter acquired;

(f)    General Intangibles: All general intangibles of EcoHarmony, whether now owned or hereafter acquired, including without limitation applications for patents, patents, copyrights, trademarks, trade secrets, good will, tradenames, customer lists, permits and franchises, software, and the right to use EcoHarmony's name, and any and all membership interests, governance rights, and financial rights in each and every limited liability company, and all payment intangibles, and all other General Intangibles (as such term may be defined in the UCC) of the EcoHarmony, whether now owned or hereafter acquired;

(g)    Chattel Paper: All Chattel Paper (as such term may be defined in the UCC) of the EcoHarmony, whether tangible or electronic, and whether now owned or hereafter acquired; and

(h) <u>Documents, Embedded Software, Etc.</u>: All of EcoHarmony's rights in promissory notes, documents, embedded software, letter of credit rights and supporting obligations (and security interests and liens securing them) (as any such term may be defined in the UCC) whether now owned or hereafter acquired;

together with all substitutions and replacements for and products of any of the foregoing property and proceeds of any and all of the foregoing property and, in the case of all tangible Collateral, together with (A) all accessories, attachments, parts, equipment, accessions, repairs and embedded software, now or hereafter attached or affixed to or used in connection with any such goods, (B) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods, and (C) all books and records of EcoHarmony.

2. <u>Representations, Warranties and Agreements of Buyer</u>. Buyer hereby represents, warrants, and agrees that:

(a) Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of Delaware. This Agreement has been duly and validly authorized by all necessary limited liability company action of Buyer. Buyer has full limited liability company power and authority to execute this Agreement, to perform its obligations hereunder and to subject the Interests to the Buyer Security Interest.

(b) Buyer's organization identification number is [＿＿＿＿＿＿＿]. Buyer's correct legal name is as set forth at the beginning of this Agreement. Buyer will give at least 30 days' advance written notice to the Secured Parties of any change in Buyer's name (other than as set forth at the beginning of this Agreement).

(c) Buyer hereby authorizes the filing of such financing statements as the Secured Parties may deem necessary or useful to be filed in order to perfect the Security Interest and, if any Collateral is covered by a certificate of title, Buyer will from time to time execute such documents as may be required to have the Security Interest properly noted on a certificate of title. In addition, Buyer authorizes the Secured Parties to file from time to time (and reaffirms its authorization of the filing of any financing statements filed prior to the date of this Agreement) such financing statements against the Collateral described as "all personal property" or "all assets" or the like as the Secured Parties deems necessary or useful to perfect the Security Interest.

3. <u>Representations, Warranties and Agreements of EcoHarmony</u>. EcoHarmony hereby represents, warrants, and agrees that:

(a) EcoHarmony is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Minnesota. This Agreement has been duly and validly authorized by all necessary limited liability company action. EcoHarmony has full limited liability company power and authority to execute this Agreement, to perform EcoHarmony's obligations hereunder and to subject the Collateral

owned by EcoHarmony to the EcoHarmony Security Interest. EcoHarmony's organization identification number is 2216468-2. EcoHarmony's correct legal name is as set forth at the beginning of this Agreement. EcoHarmony will give at least 30 days' advance written notice to the Secured Parties of any change in EcoHarmony's name (other than as set forth at the beginning of this Agreement).

(b)    The Collateral will be used primarily for business purposes.

(c)    EcoHarmony's chief place of business is [•]. EcoHarmony's records concerning its accounts and contract rights are kept at such address. The Collateral is located at the addresses set forth on <u>Exhibit A</u> attached hereto. EcoHarmony will give at least 30 days' advance written notice to the Secured Parties of any change in EcoHarmony's jurisdiction of incorporation or chief place of business and any change in or addition of any Collateral location or any change in the location of EcoHarmony's records concerning the Collateral.

(d)    EcoHarmony has (or will have at the time EcoHarmony acquires rights in Collateral hereafter arising) and will maintain title to each item of Collateral free and clear of all security interests, liens and encumbrances.

(e)    Except in the ordinary course of business, EcoHarmony will not sell or otherwise transfer or dispose of the Collateral or any interest therein; provided, that (i) any sale shall be subject to the MIPSA, and (ii) the Secured Party's Security Interests shall continue to attach to the Collateral notwithstanding any sale.

(f)    All rights to payment and all instruments, documents, chattel papers and other agreements constituting or evidencing Collateral are (or will be when arising or issued) the valid, genuine and legally enforceable obligation, subject to no defense, set-off or counterclaim (other than those arising in the ordinary course of business) of each account debtor or other obligor named therein or in EcoHarmony's records pertaining thereto as being obligated to pay such obligation. EcoHarmony will not agree to any modification, amendment or cancellation of any such obligation without the Secured Parties' prior written consent except discounts provided by EcoHarmony in the ordinary course of business, and will not subordinate any such right to payment to claims of other creditors of such account debtor or other obligor.

(g)    EcoHarmony will keep all tangible Collateral in good repair, working order and condition, normal depreciation excepted, and will, from time to time, replace any worn, broken or defective parts thereof.

(h)    EcoHarmony will, if the Secured Parties at any time so reasonably requests, promptly deliver to the Secured Parties any instrument,

document or chattel paper constituting Collateral, duly endorsed or assigned by EcoHarmony to the Secured Parties.

(i)    EcoHarmony will at all times keep all Collateral insured against risks of fire (including so-called extended coverage), theft, and such other risks and in such amounts as the Secured Parties may reasonably request, with any loss payable to Secured Parties to the extent of its interest.

(j)    EcoHarmony hereby authorizes the filing of such financing statements as the Secured Parties may deem necessary or useful to be filed in order to perfect the Security Interest and, if any Collateral is covered by a certificate of title, EcoHarmony will from time to time execute such documents as may be required to have the Security Interest properly noted on a certificate of title. In addition, EcoHarmony authorizes the Secured Parties to file from time to time (and reaffirms its authorization of the filing of any financing statements filed prior to the date of this Agreement) such financing statements against the Collateral described as "all personal property" or "all assets" or the like as the Secured Parties deems necessary or useful to perfect the Security Interest.

(k)    EcoHarmony will take all such actions as the Secured Parties may reasonably request to permit the Secured Parties to establish and perfect the Security Interests in all jurisdictions the Secured Parties deem necessary. Without in any way limiting the generality of the foregoing, EcoHarmony will execute, deliver or endorse any and all instruments, documents, assignments, security agreements and other agreements and writings which the Secured Parties may at any time reasonably request in order to secure, protect, perfect or enforce the Security Interest and the Secured Parties' rights under this Agreement.

(l)    EcoHarmony will not use or keep any Collateral, or permit it to be used or kept, for any unlawful purpose or in violation of any federal, state or local law, statute or ordinance.

If EcoHarmony at any time fails to perform or observe any of the foregoing agreements, immediately upon the occurrence of such failure, without notice or lapse of time, the Secured Parties may (but need not) perform or observe such agreement on behalf and in the name, place and stead of EcoHarmony (or, at the Secured Parties' option, in the Secured Parties' names) and may (but need not) take any and all other actions that the Secured Parties may reasonably deem necessary to cure or correct such failure (including without limitation the payment of taxes, the satisfaction of security interests, liens, or encumbrances, the performance of obligations under contracts or agreements with account debtors or other obligors, the procurement and maintenance of insurance, the execution of financing statements, the endorsement of instruments, and the procurement of repairs, transportation or insurance); and, except to the extent that the effect of such payment would be to render any loan or forbearance of money usurious or otherwise illegal under any applicable law, EcoHarmony shall thereupon pay the Secured Parties

on demand the amount of all moneys expended and all costs and expenses (including attorneys' fees) incurred by the Secured Parties in connection with or as a result of the Secured Parties' performing or observing such agreements or taking such actions, together with interest thereon from the date expended or incurred by the Secured Parties at the highest rate then applicable to any of the Obligations.

4. **Events of Default.** Buyer and/or EcoHarmony, as applicable, shall be in default under this Agreement upon the occurrence of any of the following events (each, an "Event of Default"):

(a) Buyer shall fail to make when due, whether by acceleration or otherwise, any payment of any of the Obligations and shall fail to cure such failure within any applicable cure period;

(b) Either Obligated Party shall fail to comply with any agreement, covenant, condition, provision or term contained in the MIPSA or this Agreement and shall fail to cure such failure within any applicable cure period;

(c) Any representation or warranty made by either Obligated Party in this Agreement or in any certificate, statement, report or other writing furnished by or on behalf of such Obligated Party to the Secured Parties pursuant to this Agreement, shall prove to have been false or misleading in any material respect on the date as of which the facts set forth are stated or certified or deemed to have been certified or stated; or

(d) An Act of Bankruptcy shall occur with respect to an Obligated Party (as used herein, "Act of Bankruptcy" shall mean if (i) an Obligated Party shall (1) be or become insolvent, or (2) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or the like of the person or of all or a substantial part of the person's property, or (3) commence a voluntary case under any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding under the laws of any jurisdiction, or (4) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (5) admit in writing its inability to pay its debts as they mature, or (6) make an assignment for the benefit of its creditors; or (ii) a proceeding or case shall be commenced, without the application or consent of an Obligated Party, and which is not dismissed within 90 days after such commencement, in any court of competent jurisdiction, seeking (1) the liquidation, reorganization, dissolution, winding up or the composition or adjustment of debts of such Obligated Party, (2) the appointment of a trustee, receiver, custodian or liquidator or the like of the person or of all or any substantial part of either Obligated Party's property, or (3) similar relief in respect of such Obligated Party under any law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts).

4. **Remedies upon Event of Default.** If (i) any Event of Default described in paragraph 3(d) shall occur, the Obligations shall automatically become immediately due and payable; or (ii) any other Event of Default shall occur and at any time thereafter, then Secured Parties may exercise any one or more of the following rights and remedies:

(a)    declare the Obligation to be immediately due and payable, which shall then be immediately due and payable, without presentment or other notice or demand;

(b)    exercise and enforce any or all rights and remedies available upon default to a Secured Parties under the UCC; or

(c)    exercise or enforce any or all other rights or remedies available to Secured Parties by law or agreement against the Collateral, including specifically the right to use the Collateral, against any Obligated Party or against any other person or property.

5.    **Right to Offset.** Nothing in this Agreement shall be deemed a waiver or prohibition of the Secured Parties' right of banker's lien, offset, or counterclaim, which right EcoHarmony hereby grants to the Secured Parties.

6.    **Other Personal Property.** If at the time the Secured Parties takes possession of any tangible Collateral, any goods, papers or other properties of EcoHarmony, not affixed to or constituting a part of such Collateral, are located or to be found upon or within such Collateral, EcoHarmony agrees to notify the Secured Parties of that fact, describing the property so located or to be found, within five calendar days after the date on which the Secured Parties took possession. Unless and until the Secured Parties receive such notice from EcoHarmony, the Secured Parties shall not be responsible or liable to EcoHarmony for any action taken or omitted by or on behalf of the Secured Parties with respect to such property without actual knowledge of the existence of any such property or without actual knowledge of the fact that it was located or to be found upon such Collateral.

7.    **Miscellaneous.** This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by the Secured Parties and the Obligated Parties. A waiver shall be effective only in the specific instance and for the specific purpose given. Mere delay or failure to act shall not preclude the exercise or enforcement of any of the Secured Parties' rights or remedies. All notices to be given to the Obligated Parties shall be deemed sufficiently given if mailed by registered or certified mail, postage prepaid, or delivered to each Obligated Party at Ten Penn Center, 1801 Market Street, Suite 2700, Philadelphia, PA 19103, Attn: Chief Development Officer, or at the most recent address shown on the Secured Parties' records. The Secured Parties shall not be obligated to preserve any rights the Obligated Parties may have against prior parties, to realize on the Collateral at all or in any particular manner or order, or to apply any cash proceeds of Collateral in any particular order of application. This Agreement shall be binding upon and inure to the benefit of the Obligated Parties and the Secured Parties and their respective representatives, successors and assigns. This Agreement shall be governed by the internal laws of the State of [New York], without giving effect to the conflicts of laws principles thereof.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Security Agreement the day and year first above written.

GAMESA ENERGY USA, LLC

By: Jiddu Tapia
Its: Chief Development Officer

ECOHARMONY WEST WIND, LLC

By: EcoEnergy LLC
Its: Manager

By:
Its:

ECOENERGY, LLC

By:
Its:

MORSE ENERGY, LLC

By:
Its:

*[Signature page to Security Agreement]*

EXHIBIT "C"

Eco Energy, LLC

# Invoice

2511 Technology Drive, Suite 110
Elgin, IL 60124

| Date | Invoice # |
|------|-----------|
| 11/20/2012 | 80 |

| Bill To |
|---------|
| Gamesa Energy USA<br>Attn: George Nall<br>3001 Broadway Street NE #695<br>Minneapolis, MN 55413 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
|  | Net 30 | EcoHarmony West Wind, LLC |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | Payment due per Section 2.2(b) of the<br><br>Membership Interest Purchase and Sale Agreement in Respect of EcoHarmony West Wind, LLC By and Among Gamesa Energy USA, LLC, Morse Energy, LLC and EcoEnergy, LLC Dated as of December 30, 2011 | 500,000.00 | 500,000.00 |

| | Total | $500,000.00 |

EXHIBIT "D"

# Statement

Eco Energy, LLC

2511 Technology Drive, Suite 110

Elgin, IL 60124

| Date |
|------|
| 12/31/2012 |

| To: |
|-----|
| Gamesa Energy USA<br>Attn: George Nall<br>3001 Broadway Street NE #695<br>Minneapolis, MN 55413 |

| Amount Due | Amount Enc. |
|------------|-------------|
| $500,000.00 | |

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| 10/31/2012<br>11/20/2012 | Balance forward<br>INV #80. Due 12/20/2012.<br>--- Capital Gains, 1 @ $500,000.00 = 500,000.00<br>---<br>--- Membership Interest Purchase and Sale Agreement in Respect of<br>EcoHarmony West Wind, LLC By and Among Gamesa Energy USA, LLC,<br>Morse Energy, LLC and EcoEnergy, LLC Dated as of December 30, 2011 | 500,000.00 | 0.00<br>500,000.00 |

| CURRENT | 1-30 DAYS PAST DUE | 31-60 DAYS PAST DUE | 61-90 DAYS PAST DUE | OVER 90 DAYS PAST DUE | Amount Due |
|---------|--------------------|--------------------|--------------------|----------------------|------------|
| 0.00 | 500,000.00 | 0.00 | 0.00 | 0.00 | $500,000.00 |

EXHIBIT  "E"

**THOMAS M. MELONE**
ATTORNEY AT LAW
14 WALL STREET
20TH FLOOR
NEW YORK, NEW YORK 10005

November 4, 2013

Gamesa Energy USA, LLC
Ten Penn Center
1801 Market Street, Suite 2700
Philadelphia, PA 19103
Attn: Chief Development Officer

Gamesa Technology Corporation
2050 Cabot Boulevard West
Langhorne, PA 19047
Attn: General Counsel

EcoHarmony West Wind LLC
Ten Penn Center
1801 Market Street, Suite 2700
Philadelphia, PA 19103
Attn: Chief Development Officer

Reference is made to the (1) Membership Interest Purchase and Sale Agreement (the "PSA") dated December 30, 2011, among Gamesa Energy USA, LLC, a Delaware limited liability company ("Gamesa"), Morse Energy, LLC, an Illinois limited liability company ("Morse"), and EcoEnergy, LLC, an Illinois limited liability company ("EcoEnergy") with respect to the purchase of the membership interests of EcoHarmony West Wind LLC, a Minnesota limited liability company ("EcoHarmony"), and (2) the Security Agreement (the "Security Agreement") dated December 30, 2011, among Morse and EcoEnergy (the "Secured Parties") and Gamesa and EcoHarmony (the "Obligated Parties").

I am the attorney representing both Morse and EcoEnergy.

Pursuant to Section 2.2(b) of the PSA Gamesa is obligated to pay to the Secured Parties $500,000 upon the execution of a generator interconnection agreement ("GIA") by EcoHarmony with the Midcontinent Independent System Operator, Inc. ("MISO") within 30 days of such execution. The GIA was accepted by the Federal Energy Regulatory Commission ("FERC") on March 19, 2012. The Secured Parties sent the invoice for the $500,000 payment to Gamesa on November 20, 2012, and December 31, 2012. Gamesa has failed to pay the $500,000 and is in default in its obligations under the PSA.

In addition, EcoHarmony has breached, and is in default under, its obligations under Section 2.2(d) of the Security Agreement because it has failed to maintain title to all the Collateral (which includes the GIA) by executing a termination agreement (the "GIA Termination Agreement") with MISO, which has been filed with the FERC on November 1, 2013, under Docket No. ER14-299.

EcoHarmony has also breached, and is in default under, its obligations under Section 2.2(f) of the Security Agreement because it has agreed to a cancellation and modification to the GIA, which is part of the Collateral, by executing the GIA Termination Agreement.

The breach by Gamesa in failing to make the payment required by Section 2.2(b) and the breach by the Obligated Parties caused by the execution of the GIA Termination Agreement each constitute an Event of Default under Section 4 of the Security Agreement, and an event of default under the PSA. Pursuant to Section 4(a) of the Security Agreement, the Secured Parties hereby declare all Obligations immediately due and payable under the PSA.

Section 2.2(d) of the PSA obligates Gamesa to pay $2,500,000 to the Secured Parties no later than December 30, 2014. As a result of Gamesa and the Obligated Parties being in default and the Secured Parties declaration that all Obligations are now immediately due and payable, that payment is accelerated and is now due and payable.

Pursuant to Section 2.2(k) of the Security Agreement the Obligated Parties must take all such actions as the Secured Parties reasonably request. The Secured Parties hereby demand that until the Obligated Parties pay the full $3,000,000 now due and payable, that the Obligated Parties immediately notify MISO, ITC Midwest LLC and the FERC that the Obligated Parties suspend any further action toward terminating the GIA. In addition, the Secured Parties hereby demand that the until the Obligated Parties pay the full $3,000,000 now due and payable, that the Obligated Parties immediately take all action necessary or desirable to prevent the termination of the GIA.

Please contact the undersigned at your earliest convenience to arrangement payment for the $3,000,000 now due and payable.

Very truly yours,

Thomas Melone
*Attorney for EcoEnergy and Morse*
14 Wall Street, 20th Floor
New York, NY 10005
(212) 681-1120
Fax: (801) 858-8818
Thomas.Melone@gmail.com